SPENCER, Appellant, vs. POLLOCK and another, Respondents.

*September 27 — October 25, 1892.*

*Marriage: Evidence.*

One A., a quadroon, had by her master four illegitimate children before she was twenty years old. Afterwards, in 1856 or 1857, she was lawfully married to one R., who left her a year or two later and has not since been heard from. Afterwards, not later than 1861, she commenced living with one T., a white man, under an agreement (as she testifies) that they should live together as man and wife. She at this time supposed R. was still living, and suggested that she get a divorce, but T. told her it was unnecessary and that if she would behave herself he would never forsake her, and that if she would do what was right he would take care of her and help her to take care of her children. He also told her that they would get married at a future time, but they never attempted to do so. After the death of T. she made a claim against his estate and recovered for personal services. Upon the evidence, showing the above facts among others, it is *held* that the relations between A. and T. were illicit in their inception and were never transformed into matrimony.

Spencer vs. Pollock and another.

APPEAL from the Circuit Court for *Douglas* County.

This was a proceeding commenced in the county court of Douglas county, under the provisions of ch. 286, Laws of 1881, to determine the descent of certain lands in said county owned by Jeremiah C. Tullis in his lifetime, who died intestate at his residence in Cincinnati, Ohio, March 9, 1878. The application was made by the appellant, *Spencer,* who, by his petition, set up the facts required by secs. 2 and 3 of said ch. 286. He alleged that said deceased left a widow, America Tullis, and one adult daughter, Georgia Benhouse, surviving him, as his heirs at law, and that he (*Spencer*) was the grantee of said widow and daughter, and the owner of all said lands.

Upon the hearing *Martha Pollock* and *Mary Ann Ludlow,* the respondents, who are sisters of the deceased, appeared and denied that Jeremiah Tullis was married or left any issue, and claimed to be the sole heirs at law of deceased. Upon this issue trial was had in the county court, and upon appeal in the circuit court, both courts holding that Jeremiah Tullis was never married to America, and decreeing that the title to the lands in question was in the respondents, *Martha Pollock* and *Mary Ann Ludlow.* No question was raised as to the residence or death of Tullis, or his ownership of the lands in question, nor in fact as to any of the jurisdictional facts which must exist to entitle the court to entertain the application. America Tullis (so called) was a quadroon or octoroon, with whom Jeremiah C. Tullis, who was a white man, lived and cohabited from about the year 1861 up to the time of his death in 1878, and Georgia Benhouse was the fruit of this cohabitation. The question litigated was whether this union was the union of husband and wife, or simply the maintenance of illicit relations. The circuit court found upon this question as follows:

"That America Tullis became the mother of one or more illegitimate children when quite young, and thereafter was

lawfully married to one William Redman, in the city of Cincinnati aforesaid, in 1856 or 1857; that she lived with said Redman as his wife for a year or a year and a half; that said Redman then left her and went south, since which time he has not been heard from; that, about two years after said Redman left said America Tullis, relations of an illicit character commenced between her and Jeremiah C. Tullis; that such relations continued for some time, when the parties commenced living and cohabiting together as man and wife; that no marriage ceremony was performed between said America Tullis and Jeremiah C. Tullis before they commenced living and cohabiting together, pretending to be man and wife; that there is no direct evidence or competent evidence in the case that they entered into a matrimonial contract; that it does not clearly appear, from the evidence, at what date the parties commenced living together, pretending to be man and wife, as aforesaid, but it was not later than 1861; that William Redman was alive when his wife and Jeremiah C. Tullis commenced living together as aforesaid; that said America and J. C. Tullis, without any belief on their part that Redman was dead, but with the knowledge that he was the lawful husband of said America, commenced living together as aforesaid, and so continued to live and cohabit until March, 1879, at which time he died; that, as the fruit of such living and cohabiting together, a daughter, known in these proceedings as Georgiana Benhouse, was born about 1870; and that said America Tullis and Georgiana Benhouse, at the time of the filing of the petition herein, resided at Cummingsville, Ohio; that said America Tullis was a colored woman, and J. C. Tullis was a white man; that she was the mother of illegitimate children before she married Redman, and sustained illicit relations with Tullis after she married Redman; that she deliberately, pursuant to some kind of an arrangement, commenced living with Tullis and cohabited with him,

Spencer vs. Pollock and another.

when she knew her husband was alive, or had no reason to believe that he was dead, and continued such relations without any other contract, so far as appears from any direct evidence in the case, up to the time Tullis died; that, from these facts and other evidence in the case relating to the general character of America Tullis, no presumption of fact exists or can be found to support the claim that she was ever legally married to said Jeremiah C. Tullis; that the circumstances are all consistent with the theory that the illicit relations between the parties, which commenced after Redman left said America Tullis, continued to the time Tullis died; that after said Tullis' death said America Tullis and Georgiana Benhouse commenced some judicial proceedings in the courts of Ohio to have their claim to be the heirs of said Jeremiah C. Tullis established, but that said proceedings were discontinued, leaving the question undetermined; that thereafter America Tullis made a claim against the estate of said J. C. Tullis for domestic services rendered him in his lifetime, on which claim she recovered a considerable sum of money."

The appellant excepted to most of these findings of fact, and appealed from judgment decreeing that respondents were the heirs at law of Tullis and owners of the lands in question.

For the appellant there was a brief by *Reed, Grace, Rock & Reed*, and oral argument by *H. H. Grace.* They contended, *inter alia*, that a marriage can generally be proved by showing that the parties have held themselves out as husband and wife, and by general reputation founded on their conduct. 1 Bishop, Mar., D. & S. sec. 77; Broom, Leg. Max. 947; *Duncan v. Duncan*, 10 Ohio St. 181. The relations of the parties were not illicit at the time they commenced living together. A presumption of death arises as to one who leaves his home or place of residence and is gone more than seven years. 1 Greenl. Ev. sec. 41; *Hoyt*

*v. Newbold,* 46 Am. Rep. 762; 1 Bishop, Mar., D. &. S. sec.
950. There is no presumption that the life continued dur-
ing the entire period, or that it was extinguished at any
particular time within it, nor is the rule of seven years ab-
solute. Any circumstances may be shown creating a prob-
ability that life did not continue so long. 1 Bishop, Mar.,
D. & S. sec. 950. The fact that Redman was in the army
brought him into contact with a specific peril, and raises a
presumption that he died within the seven years. 2 Whar-
ton, Ev. sec. 1277. The presumption in favor of the va-
lidity of the second marriage outweighs the presumption
of the continuance of the first husband's life. *Johnson v.
Johnson,* 55 Am. Rep. 883; *Rex v. Twyning,* 2 Barn. & Ald.
386; *Yates v. Houston,* 3 Tex. 140; 1 Bishop, Mar., D. & S.
sec. 953. To sustain marriage and the legitimacy of chil-
dren, the courts will often presume a previous divorce. *In
re Edwards,* 58 Iowa, 431; *Blanchard v. Lambert,* 43 Iowa,
228; *Carroll v. Carroll,* 20 Tex. 731; *Boulden v. McIntire,*
119 Ind. 574. Even if the contract of marriage was illegal,
for the reason of certain legal impediments, the law pre-
sumes in favor of innocence and against immorality, and
presumes a marriage occurred as soon as the legal impedi-
ment to the same was removed. *U. S. v. Hays,* 20 Fed.
Rep. 710; *Hynes v. McDermott,* 91 N. Y. 451; *Caujolle v.
Ferrie,* 23 id. 90; *Blanchard v. Lambert,* 43 Iowa, 228, 22
Am. Rep. 245; *Young's Appeal,* 52 Mich. 592.

*Phil. H. Perkins,* for the respondents, argued, among
other things, that there was never any sufficient contract of
marriage in this case. Stewart, Mar. & Div. secs. 80, 85; 1
Bishop, Mar. & Div. secs. 249, 262, 284; 1 Bishop, Mar., D. &
S. secs. 10, 11, 243, 299, 311, 365; *Cartwright v. McGown,*
121 Ill. 388, 2 Am. St. Rep. 105. A cohabitation, illicit in
its origin, is presumed to be of that character unless the
contrary be proved, and cannot be transformed into matri-
mony by evidence which falls short of establishing the fact

Spencer vs. Pollock and another.

of an actual contract of marriage. *Williams v. Williams,* 46 Wis. 480; Schouler, Dom. Rel. sec. 26; *Chamberlain v. Chamberlain,* 71 N. Y. 423; *Collins v. Collins,* 80 id. 1. Mere acknowledgments of the relation of husband and wife made idly, or to ward off prosecution, or to stifle inquiry, or to evade social criticism, are of little or no weight. *West v. State,* 1 Wis. 186; Schouler, Dom. Rel. sec. 26; *Wolverton v. State,* 16 Ohio, 173, 47 Am. Dec. 373. If the cohabitation was in its inception illicit, the presumption of the innocence and morality of the parties is at once rebutted and overcome; and, without proof of a change in their relation to each other, it will be presumed that the continuation of the connection is of the same character. *Cartwright v. McGown,* 121 Ill. 388; 1 Bishop, Mar. & Div. sec. 506; 2 Wharton, Ev. sec. 1297; *Appeal of Reading F. Ins. & T. Co.* 113 Pa. St. 204, 57 Am. Rep. 448. Marriage between parties, one of whom is bound by an existing marriage tie, is void. Schouler, Dom. Rel. sec. 21; 1 Bishop, Mar., D. & S. secs. 202, 717, 721, 729, 1028, 1029. The presumption of innocence sometimes gives rise to presumption of marriage; but such presumption is to save the innocence of the parties and will not arise if one of the parties is proved to be married to some one else. Stewart, Mar. & Div. sec. 126; *Weinberg v. State,* 25 Wis. 370; *Cartwright v. McGown,* 121 Ill. 388, 2 Am. St. Rep. 105. When the validity of a marriage depends upon the death of a former husband or wife, and there is no direct proof of this fact, the presumption of life antagonizes that of innocence. 1 Bishop, Mar., D. & S. secs. 949, 1026, 1027.

WINSLOW, J. It seems plain to us that, if the circuit court was right in his finding that the relations between Jeremiah C. Tullis and America Tullis were illicit in their inception, the judgment here must be affirmed. In *Williams v. Williams,* 46 Wis. 464–480, this court adopted the

rule there stated as follows: "A cohabitation illicit in its origin is presumed to be of that character, unless the contrary be proved, and cannot be transformed into matrimony by evidence which falls short of establishing the fact of an actual contract of marriage. Such contract may be proved by circumstances, but they must be such as to exclude the inference or presumption that the former relation continued, and satisfactorily prove that it had been changed into that of actual matrimony by mutual consent."

An examination of the evidence leads our minds to the same conclusion as that reached by the circuit judge, namely, that the relations between the parties were meretricious in their origin. The facts that she had borne four illegitimate children by her master before she was twenty years of age, and that she was married to Redman about 1856 or 1857, appear from her own testimony. It also appears that Redman left her a year or two after they were married. She also testified that before the war she and Jeremiah Tullis made an agreement to live together as man and wife, and that they thereafter lived together under that agreement. From this testimony it is claimed that a common-law marriage is proven. Conceding her testimony as to the agreement to be competent (a point not decided), it is effectually discredited by other portions of her own testimony. She supposed that her husband, Redman, was still living. She says she told Tullis about him, and said that she expected she would have to get a divorce, but Tullis told her that if a man went away from his wife three years she did not need a divorce, and that "if *I would behave myself* he would never forsake me." She says: "We were going to Michigan, and he said we would get married when we got there. We never tried to get married while we lived here." Again she says: "He promised me *if I would do what was right* he would take care of me, and help me take care of my other children."

These statements point rather to illicit cohabitation than to cohabitation as husband and wife. It also appears from her own testimony that she made a claim against Tullis' estate for household labor, washing, cooking, ironing, etc., from and after 1860, and that she received $1,200 thereon.

Without elaborating upon the evidence further, it seems sufficient to say that the conclusion forced upon our minds is the same as that reached by the circuit judge, namely, that the relations between the parties were illicit in their inception. This view of the case renders further comment unnecessary. There is no evidence to show that the relation so commenced was ever transformed into matrimony. No presumption of such change can be indulged in, because America Tullis herself says that they never tried to get married.

· *By the Court.*— Judgment affirmed.

