SAMUEL W. HAYES, ⎫
R. L. WILLIAMS, ⎪
MATTHEW J. KANE, ⎬  Justices.
JESSE J. DUNN, ⎭

*In re* DAVIS' ESTATE.

No. 1382.  Opinion Filed March 12, 1912.

(122 Pac. 547.)

1.   INDIANS—Lands—Allotments—Statutory Provisions.  The act of Congress of April 28, 1904, c. 1824, 33 St. at L. 573, continuing and extending in their operation all the laws of Arkansas theretofore put in force in the Indian Territory, so as to embrace all persons and estates in said territory, whether Indian, freedman, or otherwise, was not intended to and did not work a repeal of section 15 of the act of July 1, 1902, c. 1362, 32 St. at L. 642, providing that lands allotted to members and freedmen of the Chickasaw and Choctaw Nations should not be affected by any deed, debt, or obligation, of any character, contracted prior to the time at which said land might be alienated.

2.   SAME—Exemptions.  The allotted lands of a deceased Choctaw freedman are not liable for any debt or obligation, of any character, contracted prior to the time at which such allotment may be alienated; hence cannot be sold by order of the county court for such purpose.

3.    **SAME**—"Affected"—"Incumbered." Section 15 of the act of July 1, 1902, providing that lands allotted to members and freedmen of the Choctaw and Chickasaw Nations shall not be "affected" or "incumbered" by any deed, debt, or obligation, of any character, contracted prior to the time at which said land may be alienated, means that there shall be no burden on the title or charge against such allotment, and that the same shall in no event become liable for any debt or obligation contracted prior to the removal of restrictions.

4.    **SAME**—Executions. Belton Davis, a Choctaw freedman allottee, died intestate December 26, 1907, possessed of an allotment of lands in the former Chickasaw Nation. At the time of his death, he was indebted in a sum largely in excess of the value of his personal estate, and upon application of the administrator of the estate the county court made an order directing the sale of said allotment, for the purpose of paying the debts of the estate contracted during the lifetime of the allottee. **Held**, that the court erred in directing the sale.

(Syllabus by Sharp, C.)

*Error from District Court, Carter County;*
*S. H. Russell, Judge.*

In the matter of the estate of Belton Davis, deceased; L. J. Akers, administrator. From an order directing the administrator to sell allotted lands for the payment of debts of decedent, Z. T. Harmon, the purchaser of the lands from the heirs of decedent, appeals. Reversed, with directions to dismiss petition for order of sale.

Belton Davis, a Choctaw freedman, had allotted to him 40 acres of land in Carter county. On the 26th day of December, 1907, he died intestate, in possession of his allotment, leaving as his sole and only heir at law his father, Lewis Davis, who, on the 17th day of March, 1908, sold said allotment to the plaintiff in error, Z. T. Harmon, who thereupon went into possession of said lands. On the 24th day of January, 1908, L. J. Akers, the defendant in error, was duly appointed administrator of the estate of said Belton Davis, deceased. Belton Davis left personal property of the value of $133.24, and on the 19th day of February, 1908, claims were allowed against his estate by the county court of Carter county, amounting to $520.35. All of said claims, except $9.90, which was for coffin and burial expenses, were for debts incurred during his lifetime. On the 16th day of

May, 1908, the administrator filed in the county court his petition, praying that the allotment of said Belton Davis, deceased, be sold for the payment of the debts of his estate and the expenses of administration. In said petition, the debts were estimated at $571.30; accrued costs of administration, $30; estimated additional expense of administration, $25. Thereupon Z. T. Harmon filed his protest in writing against such sale, and on the 24th of August, 1908, said protest was overruled, and the county court ordered and directed the sale of said allotment for the purposes stated. Z. T. Harmon appealed from said order to the district court of Carter county, which appeal was tried on an agreed statement of facts, resulting in a judgment in favor of the administrator and an order directing the sale of the allotted lands, as prayed for. From this judgment, an appeal has been prosecuted to this court.

*Johnson & McGill,* for plaintiff in error.

*Thos. Norman,* for defendant in error.

Opinion by SHARP, C. (after stating the facts as above). The decision of this case rests upon the construction of certain sections of the various acts of Congress governing allotments made to Choctaw freedmen in the Choctaw and Chickasaw Nations, as well as other acts extending over and putting in force, as to said freedmen, certain of the laws of Arkansas theretofore in force in the Indian Territory.

Counsel for plaintiff in error rest their case primarily upon the act of July 1, 1902, ratified by the Choctaws and Chickasaws September 25, 1902 (32 St. at L. 642), and upon the provisions of the act of April 26, 1906, c. 1876, 34 St. at L. pt. 1, p. 137, providing for the final disposition of the affairs of the Five Civilized Tribes in the Indian Territory.

Defendant in error relies principally upon the act of April 28, 1904 (33 St. at L. 573), entitled "An act to provide for additional United States judges in the Indian Territory, and for other purposes." Other acts of Congress, tending to show the object and purpose of Congress and the policy of the federal govern-

ment in its dealings with the citizens and freedmen of the Chickasaw and Choctaw Nations, are mentioned, and will be hereafter referred to.

We shall consider, first, the act of April 28, 1904. This act continues and extends in their operation all the laws of Arkansas theretofore put in force in the Indian Territory, so as to embrace all persons and estates in said territory, whether Indian, freedman, or otherwise. Assuming, without deciding, that this provision has reference to all the laws of Arkansas, on whatsoever subject, theretofore put in force by any former act of Congress, beginning with the act of March, 1, 1889, creating a United States court at Muskogee, the foregoing provision would mean that neither the adoption nor the enactment of any new law was intended, but that the extension or carrying forward of certain laws, already in force as to United States citizens in the Indian Territory, and under certain conditions to others, to all persons and estates, including freedmen, not theretofore subject to such jurisdiction was intended. But in this act, while in terms containing no exception or saving clause, to be given the broad construction contended for by defendant in error and sustained by both the county and district courts? The exact question has never before been considered by this court.

The right of Choctaw freedmen to participate to a limited extent in the allotment of lands, in both the Choctaw and Chickasaw Nations, was recognized in the act of June 28, 1898, c. 517, 30 St. at L. 495. In section 29 of the foregoing act, it was provided that Choctaw freedmen should be entitled to an allotment of land equal in value to 40 acres of the average land of the two Nations, which should be nontaxable and inalienable while the title remained in the original allottee, but not to exceed 21 years from the date of patent.

In the Supplemental Agreement, approved July 1, 1902, and ratified by the Choctaw and Chickasaw Nations September 25, 1902 (32 St. at L. 642), in section 11 thereof, it was provided that each Choctaw freedman, as soon as practicable after the approval of the Secretary of the Interior of his enrollment, was

entitled to lands equal in value to 40 acres of the average allottable lands of the Choctaw and Chickasaw Nations. Section 13 provided that the allotment of each Choctaw freedman should be inalienable during the lifetime of the allottee, not exceeding 21 years from the date of the certificate of the allotment; while section 15 provided:

"Lands allotted to members and freedmen shall not be *affected or incumbered by any deed, debt, or obligation of any character contracted prior to the time at which said land may be alienated under this act,* nor shall said lands be sold except as herein provided." (Italics ours.)

All allotments, both to citizens and freedmen, were made under the provisions of the act of July 1, 1902.

The act of April 21, 1904, c. 1402, 33 Stat. 189, provided for the removal of restrictions as follows:

"And all the restrictions upon the alienation of lands of all allottees of either of the Five Civilized Tribes of Indians who are not of Indian blood, except minors, are, except as to homesteads, hereby removed, and all restrictions upon the alienation of all other allottees of said tribes, except minors, and except as to homesteads, may, with the approval of the Secretary of the Interior, be removed under such rules and regulations as the Secretary of the Interior may prescribe," etc.

On April 28, 1904, Congress passed an act entitled "An act to provide for additional United States judges in the Indian Territory, and for other purposes," which act, among other things, provided that:

"All the laws of Arkansas heretofore put in force in the Indian Territory are hereby continued and extended in their operation, so as to embrace all persons and estates in said territory, whether Indian, freedmen, or otherwise, and full and complete jurisdiction is hereby conferred upon the district courts in said territory in the settlements of all estates of decedents, the guardianships of minors and incompetents, whether Indians, freedmen, or otherwise."

It can hardly be said to be probable that Congress passed a partial removal of restrictions act on April 21st, and seven days thereafter enacted a law removing all restrictions. It can scarcely be doubted that the two acts were under consideration at the

hands of Congress at the same time, though the former received executive approval a few days before the latter act. The latter act is general; it simply extended certain laws to new classes, including freedmen, and their estates. It did not purport by express language, to have to do with the lands of the allottees in the Indian Territory, save in conferring upon the United States courts in the Indian Territory full and complete jurisdiction in the settlement of all estates of decedents and guardianships of minors and incompetents. This latter jurisdiction in the United States courts did not exist at the time of the passage of the act. *In re Poff's Guardianship,* 7 Ind. T. 59, 103 S. W. 765; *Hayes v. Barringer,* 7 Ind. T. 59, 103 S. W. 765; *Hayes v. Barringer,* 7 Ind. T. 697, 104 S. W. 937; *In re Feland's Estate,* 26 Okla. 448, 110 Pac. 736. The latter act contains no repealing clause.

It is urged by counsel for defendant in error that the passage of said act evidenced an intent to subject the administration of the estates of all persons in the Indian Territory, whether Indian, freedmen, or white, to the same laws, and that the Indian and freedmen estates should be subject to the payment of debts the same as those of deceased white men. This, we admit, must be the necessary conclusion, if the act is given the interpretation contended for.

It is a familiar rule of statutory construction that subsequent legislation may be considered as an aid to the interpretation of prior legislation upon the same subject. *Tiger v. Western Investment Co. et al.,* 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738. We will therefore consider such subsequent legislation as may come within the rule announced. The act of April 26, 1906, in section 3, provided that:

"Lands allotted to freedmen of the Choctaw and Chickasaw Tribes shall be considered 'homestead,' and shall be subject to all the provisions of this or any other act of Congress, applicable to homesteads of citizens of the Choctaw and Chickasaw Tribes."

Section 5 provides that, if an allottee should die before his patent or deed became effective, the title to the lands described

therein should inure to and vest in his heirs, and, in case any allottee should die after restrictions had been removed, his property should descend to his heirs or lawful assigns as if the patent or deed had issued to the allottee during his life.   Sections 19, 20, 22, and 23, contain inhibitions against alienation, in any manner, of allotted lands of full bloods for the period of 25 years, unless such restrictions shall, prior to the expiration of such period, be removed by act of Congress; provide for the manner in which full-blood Indians of either of the Five Civilized Tribes may make certain leases of their allotments; provide that lands upon which restrictions are removed shall be subject to taxation, but that other lands shall be exempt therefrom, so long as the title remains in the original allottee; further provide for the making of agricultural leases, their approval, etc., how the allotments of minors and incompetents may be rented or leased, and for the recording of certain leases in conformity to the law applicable to recording instruments then in force in the Indian Territory; authorized adult allottees of deceased Indians to sell and convey inherited lands; provided for the manner of sale where there were both adult and minor heirs, and that the same should be subject to the approval of the Secretary of the Interior; and authorized the making of wills, and provided how the wills of full-blood Indians devising real estate should be executed.

Resort may also be had to the act of May 27, 1908, c. 199, 35 St. at L. 312, but as an aid only to the interpretation of the act of April 21, 1904.   Said act had for its purpose, as expressed in the preamble thereof, the removal of restrictions from part of the land of allottees of the Five Civilized Tribes.   Among other provisions is the following:

"All lands, including homesteads, of said allottees enrolled as intermarried whites, as freedmen, and as mixed blood Indians, having less than half Indian blood, including minors, shall be free from all restrictions."

The act contains inhibitions against the right of alienation, contract to sell, the execution of powers of attorney, or other·

incumbrance, prior to April 26, 1931, except where restrictions are removed by the Secretary of the Interior, etc., provides for and regulates the leasing of allotted lands by a guardian or a curator, as well as other provisions not necessary to here enumerate. The act deals extensively with the question of the removal of the restrictions and the rights of allottees.

The question then arises: Why the necessity of the passage of the act of April 26, 1906, and of May 27, 1908, if Congress had intended, by the act of April 21, 1904, to confer full dominion of allotted lands to the allottees, and to thenceforth affix all the burdens and liabilities that attach where no restrictions are imposed? If, as contended for, all the laws of Arkansas in force in the Indian Territory were continued and extended to the persons and estates of all alike, then what could be the object and purpose of such subsequent legislation? In so far as such laws were extended and continued, they applied with equal force to both citizens and freedmen. Among other laws then in force in the Indian Territory was chapter 155, Mansf. Dig. (Ind. T. Ann. St. 1899, c. 58), on the subject of Wills and Testaments. In section 1 of said act, it was provided that any person 21 years of age and upwards, of sound mind, might, by last will and testament, devise all of his estate, real and personal, and all interest therein. Section 639 of Mansf. Dig. provided that all lands, tenements, and hereditaments might be aliened, and possession thereof transferred by deed, without livery of seisin, etc. Other provisions of the Arkansas law provided for the assessment, levy, and collection of taxes.

The title to real estate carried with it, as a necessary incident of ownership, the right to alienate and the corresponding liability for debts, save where exempted by statute. This was the law under which the noncitizen of these tribes, living in the Indian Territory, was governed. But the policy of the federal government in its dealings with the members of the Five Civilized Tribes and the freedmen, their former slaves, and their descendants, has always been and is now one of direct control. They were regarded as wards of the federal government. This

position is in direct conflict with and repugnant to the idea that Congress, by the passage of the act of April 28, 1904, conferred upon and subjected to persons and estates of both Indians and freedmen the privileges and burdens of the Arkansas statutes in force in the Indian Territory.   Both prior and subsequent legislation and the continued policy of the federal government show conclusively that Congress had no such thought, and that whatever may have been its intention in the passage of said last-mentioned act, the allotments of citizens and freedmen remained the subject of further special legislation on the part of Congress.

It is a well-settled rule in construing statutory provisions that repeals by implication are not favored, and that when two statutes, covering in whole or in part the same matter, are not absolutely irreconcilable, effect should be given, if possible, to both.   Numerous authorities on repeal by implication are reviewed in *Huston v. Scott et al.,* 20 Okla. 142, 94 Pac. 512, 35 L. R. A. (N. S.) 721, including former decisions of the Supreme Court of the territory of Oklahoma.   It is there said, in quoting from Endlich on the Interpretation of Statutes (section 210) :

"But repeal by implication is not favored.   It is a reasonable presumption that the Legislature did not intend to keep really contradictory enactments in the statute book, or to effect so important a measure as the repeal of a law without expressing an intention to do so.   Such an interpretation, therefore, is not to be adopted, unless it be inevitable.   Any reasonable construction which offers an escape from it is more likely to be in consonance with the real intention.   Hence it is a rule, founded in reason as well as in abundant authority, that, in order to give an act not covering the entire ground of an earlier one, nor clearly intended as a substitute for it, the effect of repealing it, the implication of an intention to repeal must necessarily flow from the language used, disclosing a repugnancy between its provisions and those of the earlier law so positive as to be irreconcilable by any fair, strict, or liberal construction of it, which would, without destroying its evident intent and meaning, find for it a reasonable field of operation, preserving, at the same time, the force of the earlier law, and construing both together in harmony with the whole course of legislation upon the subject."

In the case of *Jefferson v. Winkler*, 26 Okla. 653, 110 Pac. 755, it was said by this court:

"In other words, construe all of the foregoing provisions of said act together. We think it was the legislative intent to provide that the allotted lands of the freedmen and mixed bloods, and Indians having less than half blood, under the age of eighteen, if female, and under the age of 21, if a male, may sell under the supervision and jurisdiction of the probate courts of the state, and not otherwise."

Section 2 of the act referred to defined a minor to be a female under the age of eighteen years, or a male under the age of 21 years. It was held that these provisions as to age and right of alienation governed, and not section 877 of Wilson's Rev. & Ann. St. 1903, which authorized all male persons of the age of 21 years and all female persons of the age of eighteen years, and all persons *who had legally married, of whatever age,* to convey or make any contract relating to real estate, or any interest therein. The marriage of the minor, in that case, was on the 13th day of May, 1908; her conveyance on the 21st of August thereafter, and while the laws of Oklahoma, authorizing a legally married minor to convey real estate, were in force. This conclusion of the court could not have been reached had the Oklahoma statute, considered separate and apart from the act of Congress referred to, been given its full and literal meaning.

It was held, in *Wilson, Guardian, v. Morton et al.,* 29 Okla. 745, 119 Pac. 213, that the provisions of Mansf. Dig., pertaining to the sale of minors' lands, did not govern, and had no application in the case of the sale by the heirs of a deceased Indian to inherited, allotted lands, where there were adult as well as minor heirs; and that section 22 of the act of April 26, 1906, though radically different, governed such sales exclusively. The general laws, first of Arkansas, put in force in the Indian Territory, afterwards of Oklahoma, were not intended to work a repeal of any of the provisions of the special acts of Congress, providing for the alienation of Indian lands. Congress specially reserved the right in the Enabling Act to legislate with reference to these lands; and where there is a conflict between the pro-

visions of an act, general in its terms, and some special law passed for a specific purpose, the former act, even though subsequent in point of time, must give way.  But in this case we do not agree that there is necessarily any conflict, but rather that the effect of the act of April 28, 1904, was to put in force, as to the citizen and freedman, such laws of the state of Arkansas, theretofore in force in the Indian Territory, as were not in conflict with any previous acts of Congress governing the right of control and alienation of allotted lands.

Much of the legislation for the Indian Territory enacted by Congress adopted certain statutes "so far as applicable," or "which were not locally inapplicable or not in conflict with this act, or with any law of Congress, relating to the subject specially mentioned in this section," etc.  Section 6, Act of March 1, 1889, c. 333, St. at L. vol. 25, p. 783, and section 31, Act of May 2, 1890, c. 182, St. at L. vol. 26, p. 94.  Various other acts of Congress, not necessary to here direct special attention to, contain like or similar provisions.  Such was an almost necessary provision in the case of the extension of the laws of one state over that of another territory by act of Congress.  It was largely in this form that Congress legislated for the people of the Indian Territory.  But this is not true wherein it dealt with the Indian tribes, except, perhaps, in matters not affecting the control or alienation of their lands.  There, always, the legislation was direct and specific.  Such, we think, is a fair interpretation to be given to the provisions of said act.  Any other construction would work an entire repeal of all previous legislation—a conclusion not warranted, as we have already shown.

Having thus concluded, the remaining question is:  What is meant by the language of section 15 of the act of July 1, 1902, wherein it says that lands allotted to members or freedmen shall not be affected or incumbered by any deed, debt, or obligation, of any character, contracted prior to the time at which said lands may be alienated under said act, nor shall said lands be sold, except as therein provided?

In *Western Investment Co. v. Kistler,* 22 Okla. 222, 97 Pac. 588, this court held that the language of section 16 of the Creek Supplemental Treaty (Act of June 30, 1902, c. 1323, 32 St. at L. 503) provided that lands allotted to citizens should not in any manner whatever, or at any time, be incumbered, taken or sold to secure or satisfy any debt or obligation, nor be alienated by the allottee or his heirs, before the expiration of five years from the date of the approval of said agreement, except with the approval of the Secretary of the Interior. The language of the Creek Treaty differs somewhat from that of the Choctaw and Chickasaw Treaty, but not materially.

The word "affect" means to act upon; to produce an effect or change upon. While "incumber," in the sense used, means to load with debts, or other legal claims. Webster's International Dictionary. In a legal sense, the word "affect" is often used in the sense of acting injuriously upon persons and estates; hence, where an act provides that nothing therein shall be construed to affect the rights of any person, it means that the section must not be so construed as to prejudice or to injuriously affect such rights. *Baird v. St. Louis Hospital Ass'n* (Mo.) 21 S. W. 13; *Id.,* 116 Mo. 419, 427, 22 S. W. 726; *Tyler v. Wells,* 2 Mo. App. 526-538. In *Ryan et al. v. Carter et al.,* 93 U. S. 78, 23 L. Ed. 807, it was said:

"It is unnecessary to give the various definitions of the word 'affect.' It is enough to say that it is often used in the sense of acting injuriously upon persons and things; and in this sense, we are of the opinion, it was used in this proviso. This interpretation accords with the reason and manifest intent of the proviso."

"Encumber" or "incumber," in its legal sense, means a burden on the title or a charge on the property; a claim or lien on an estate, which may diminish its value.

It is clear, we feel, that the above provision of the Supplemental Agreement should be construed to mean that allotted lands of members and freedmen of the Chickasaw and Choctaw Nations should in no manner be charged with or burdened by or injuriously affected with any debt, of any character, con-

tracted during the restricted period, and that the estate of Belton Davis, a deceased Choctaw freedman, should in no wise be liable for any debt contracted during his lifetime; he having died prior to the passage of the act of May 27, 1908.

Section 2296, Revised Statutes of the United States (U. S. Comp. St. 1901, p. 1398), dealing with the subject of homesteads of settlers upon the public lands, provides:

"No lands acquired under the provisions of this chapter shall in any event become liable to the satisfaction of any debt contracted prior to the issuing of patent therefor."

This provision has been the subject of frequent construction. In *Sorrels v. Self, Adm'r,* 43 Ark. 451, Cockrill, C. J., speaking for the Supreme Court of Arkansas in this connection, said:

"Under this authority, Congress declared that a homestead should be given to an actual settler on certain conditions, and it was provided, in case he should die without receiving a patent therefor, that it should issue to his widow or heirs. This, as we have seen, Congress had the unquestioned right to direct. The heirs of the deceased homsteader, in this case, availed themselves of the provision and took the title to themselves. It is not necessary to inquire whether Congress intended by this provision to invest them with the title free from the claims of creditors of their ancestor; for, in section 2296 of the same chapter of the Revised Statutes, it is declared 'that no lands acquired under the provisions of this chapter shall in any court become liable to the satisfaction of any debt contracted prior to the issuing of the patent therefor.' Effect has been given to this provision of the statute by the courts whenever the question has arisen. *Seymour v. Sanders,* 3 Dill. 437 [Fed Cas. No. 12,690]; *Gile v. Hallock,* 33 Wis. 523; *Nycum v. McAllister,* 33 Iowa, 374. It is held that a judgment obtained on a debt contracted before the patent issued is not a lien on land acquired under the act, and that the land cannot be sold under execution from such judgment, whether it belongs to the original settler or a purchaser from him. *Miller v. Little,* 47 Cal. 348; *Russell v. Lowth,* 21 Minn. 167 [18 Am. Rep. 389]."

In support of this conclusion see *In re Daubner* (D. C.) 96 Fed. 805; *Wallowa Nat. Bank v. Riley,* 29 Ore. 289, 45 Pac. 766, 54 Am St. Rep. 794; *Coleman v. McCormick,* 37 Minn.

179, 33 N. W. 566; *Towner v. Rodegeb,* 33 Wash. 153, 74 Pac. 50, 99 Am. St. Rep. 936. Nor is this rule in conflict with the decision of this court in *Shelby et al. v. Ziegler,* 22 Okla. 799, 98 Pac. 989, or the Circuit Court of Appeals for the Eighth Circuit in the case of *Brun v. Mann,* 151 Fed. 145, 80 C. C. A. 513, 12 L. R. A. (N. S.) 154, as in both of these cases the judgments were for torts, and not for debts contracted. The effect of these decisions is to hold that the homestead should pass to the actual settler on the performance of certain conditions, and, in case he should die without receiving a patent therefor, that it should issue to his widow or heirs, according to the provisions of the homestead law, free and discharged of any debt contracted by the settler prior to the time that the patent issued therefor.

Section 5 of the act of April 26, 1906, provides that all patents or deeds shall issue in the name of the allottee, and that, if such allottee should die before such patent or deed becomes effective, the title to the lands therein described should inure to and vest in his heirs, and, in case such allottee should die after restrictions had been removed, his property should descend to his heirs or lawful assigns, etc. This provision is in conflict with section 2522, Mansf. Dig. (Ind. T. Ann. St. 1899, sec. 1820), which provides that the title to any real estate of inheritance shall descend and be distributed in parcenary to the kindred of the deceased, male or female, subject to the payment of debts and the widow's dower, etc. Thus we find this subsequent special provision directing the devolution of title, but which makes no provision for the payment of debts. Even were we to admit, which we do not, that the act of April 28, 1904, impliedly repealed all former legislation governing the control and alienation of allotted lands, would not this latter special act work an express repeal of such previous act? Besides, the latter act contains a clause repealing all acts and parts of acts inconsistent with its provisions. So that, if we should accept the view of the defendant in error and give effect to the act of April 28, 1904, yet it would not serve the purpose claimed for it, as clearly there would be an express repeal of the very act within which he at-

tempts to bring himself. That Congress had the right to determine the terms upon which allotted lands should descend is no longer an open question since the decision of the Supreme Court in *Tiger v. Western Investment Co.*, 221 U. S. 286, 31 Sup. Ct. 578, 55 L. Ed. 738.

We have given this case careful and thoughtful consideration, and have been aided in our work by able and comprehensive briefs, as well as oral arguments, and conclude that the judgments of both the county court and district court of Carter county were wrong and based upon an erroneous conception of the law.

The judgment of both courts should therefore be reversed, with instructions to dismiss the petition of the administrator for the sale of the allotted lands of Belton Davis, deceased.

By the Court: It is so ordered.