## PALMER v. CULLY *et al.*

No. 5332.    Opinion Filed November 16, 1915

(153 Pac. 154.)

1.    **INDIANS—Statutes—Operation.** Act Cong. April 28, 1904, c. 1824, 33 Stat. 573, providing that "all the laws of Arkansas heretofore put in force in the Indian Territory are hereby continued and extended in their operation so as to embrace all persons and estates in said territory, whether Indian, freedman, or otherwise," was not intended to supplant or supersede any special enactment of Congress with regard to Indians, but the purpose and effect thereof were to abolish all general existing tribal laws of the Seminoles, and to substitute therefor the laws in force and which had for years governed all persons in Indian Territory, save Indians in their intercourse with one another.

2.    **INDIANS—Marriage Contract—What Law Governs.** Upon the erection of the state, members of the tribes became citizens of Oklahoma, subject to the general state laws relative to marriage

and divorce, since which time the validity of their marriage contracts and all rights consequent thereon have been dependent upon such laws.

3.   **MARRIAGE—Common-Law Marriage—Validity.** A common-law marriage is valid in this state. .

4.   **CONTRACTS—"Mistake of Law."** A "mistake of law" happens when a party, having full knowledge of the facts, comes to an erroneous conclusion as to their legal effect. It is a mistaken opinion or inference arising from an imperfect or incorrect exercise of the judgment upon the facts as they really are.

5.   **CANCELLATION OF INSTRUMENTS—Deed—Mistake of Law.** "A mere mistake of law, not accompanied with other circumstances demanding equitable relief, constitutes no grounds for rescission, cancellation, or reformation of a deed to lands based upon such mistake"—following **Campbell v. Newman**, 51 Okla. 121, 151 Pac. 602.

(Syllabus by Bleakmore, C.)

*Error from District Court, Seminole County;*
*Tom D. McKeown, Judge.*

Action by Pheney Palmer against Wallace C. Cully, administrator, and others. Judgment for defendants, and plaintiff brings error. Affirmed.

*John W. Willmott,* for plaintiff in error.

*F. H. Reed* and *J. A. Baker,* for defendants in error.

Opinion by BLEAKMORE, C. This action was commenced in the district court of Seminole county on September 27, 1912, by plaintiff in error, to cancel certain deeds as a cloud upon and to quiet title to the land described therein. The parties will be referred to as they appeared below.

The allegations of the petition necessary to the determination of the questions presented for review are, in substance, that plaintiff is a full-blood Seminole Indian, illiterate, and ignorant of the law; that she is the widow of one Kintah Palmer, a Seminole Indian, who died in-

testate and without issue, in March 1912, seised and possessed of certain lands, an undivided one-half interest in and to which passed to plaintiff as his widow; that in June, 1912, she executed and delivered to one Thomas Palmer, the brother and heir at law of her deceased husband, a warranty deed purporting to convey her interest in said land, and that thereafter on June 18, 1912, said Thomas Palmer executed and delivered to defendants Hyde and Mathis a purported conveyance thereof; that Thomas Palmer was her brother-in-law, in whom she reposed the utmost faith and confidence; that at the time of the execution of said deed of June 3, 1912, he falsely and fraudulently represented to her that she was not the widow of Kintah Palmer, in that she had not been lawfully married to him, and therefore did not take any interest in said land, but inasmuch as she had lived with Kintah for many years as his wife, offered to pay her $50 then and a like sum when she vacated said land; that believing said false representations to be true, and relying thereon, she was induced thereby to execute said deed, which she understood and believed at the time to be a mere acknowledgment of the receipt by her of said $50 and his agreement to pay the same amount when she removed from the land; that the defendants Hyde and Mathis had full knowledge of the facts and circumstances under which said deed was executed at the time of the pretended conveyance of the land to them by said Thomas Palmer. Upon the trial, plaintiff amended her petition as follows:

"The plaintiff further alleges that the said pretended deed executed by herself to the defendant Thomas Palmer was obtained and secured from her by reason of a mutual mistake of fact as to her true relationship with the de-

ceased allottee, Kintah Palmer, and that, had it not been for the mutual mistake, the plaintiff would not have executed said deed. That said mistake of fact occurred and was brought about in the following manner, to-wit: That the defendant Thomas Palmer and Attorneys Johnson and Patterson, lawyers appointed by the government to represent the Seminole allottees, informed this plaintiff that she was not the lawful wife of Kintah Palmer, deceased, and caused and induced her to believe that as a matter of fact she possessed no interest, title, or estate in or to the said tract of land, and because of such mistake, and because of the alleged fraudulent and false representations of fact of Thomas Palmer, as hereinabove set out, this plaintiff was induced to sign her name to the papers at the time and date mentioned."

It is disclosed by the evidence that plaintiff had been married in accordance with the Seminole laws to one John Bowlegs, but that she was separated and divorced from him under the tribal laws. She was married to Kintah Palmer according to the Seminole custom some time in the spring of 1905. Prior to such marriage Kintah Palmer had also been married under the tribal law to Lowina Palmer, and had lived with her until about a year before he so married plaintiff. On May 1, 1911, Lowina Palmer obtained a divorce from Kintah by decree of the district court of Seminole county.

Being interrogated by counsel for defendants with reference to living with Kintah Palmer after his divorce from Lowina, plaintiff testified as to a conversation had with one Patterson, an attorney representing the Seminole Indians and employed in the office of a special assistant to the federal Attorney General, whom she consulted as to the validity of her marriage to Kintah Palmer and her rights thereunder, as follows:

"Q. Then didn't Mr. Patterson ask you why you and Kintah didn't marry by license after Kintah's divorce, and you said Kintah refused to do it? A. I told Mr. Patterson that Kintah said that the Seminole laws were in operation, and that we had married according to the Seminole law, and that it was not necessary to get another ceremony performed; that is what Kintah told me, and that is what I told Mr. Patterson."

The testimony of other witnesses is that plaintiff was recognized as the wife of Kintah Palmer both before and after the divorce from Lowina, obtained in the state court, by all those who knew her.

The laws of the Seminole Tribe were introduced in evidence as follows:

"LAW GOVERNING MARRIAGES IN THE SEMINOLE TRIBE OF INDIANS.

"Be it further enacted that our laws shall be as follows:

"First. Hereafter, if any man desires to marry a woman in the Seminole Nation, he shall first notify the parents, if living, or the nearest relatives of the woman, of his intention of so marrying her.

"On the other hand, ·if it appears that they did not secure the consent of the father or mother, or the nearest relatives of the woman to this marriage, and that the contract has been between the man and the woman only, it shall be the duty to examine them carefully, and ascertain if it is their intention to live together as man and wife, and if upon examination it is found that it is their intention to live together as man and wife, they shall not be disturbed."

"LAWS OF MARRIAGE AND DIVORCE OF THE SEMINOLE TRIBE OF INDIANS.

"Be it enacted that our laws shall be as follows:

"Article One. Any persons having been married according to the laws, and are living together, taking care of each other as man and wife in their own house, and one should leave the other without the fault of the other, shall pay the party so left the sum of $50.00.

"Article Two. But it shall not be lawful for either party to allege a complaint at law against the other immediately on separation, and no action shall be taken according to law until two months have elapsed after separation.

"Article Three. After the legal proceedings have been had, either party shall be entitled to take their individual property or goods away with them.

"Article Four. Providing, however, that if they have any property in common, or that is, if they have accomplished any work of value together, or their property is so mixed that it cannot be easily determined by the parties, then it shall be the duty of the council to award to each their individual share.

"Article Five. But in the event that if either party shall not complain upon the separation of the other, according to law, for a period of six months, they shall be deemed to have been legally divorced."

By Act Cong. May 2, 1890, 26 Stat. 81, c. 182, jurisdiction in all civil cases (except those over which the tribal courts had exclusive jurisdiction) was conferred upon the United States Court established in the Indian Territory by Act March 1, 1889, c. 333, 25 Stat. 783, the clerk of which court was authorized to issue marriage licenses and certificates to solemnize marriages, and certain general laws of the State of Arkansas contained in

Mansfield's Digest were extended over and put in force in said Indian Territory, among which were chapters 52 and 103 of said digest, relating respectively, to divorce and marriage. Said act of Congress also provided that:

"Wherever in said laws of Arkansas the courts of record of said state are mentioned the said court in the Indian Territory shall be substituted therefor." (26 Stat. 95, sec. 31.)

By said act it was also provided:

"Provided, that all marriages heretofore contracted under the laws or tribal customs of any Indian nation now located in the Indian Territory are hereby declared valid, and the issue of such marriages shall be deemed legitimate and entitled to all inheritances of property or other rights, the same as in the case of the issue of other forms of lawful marriage; Provided further, that said chapter one hundred and three of said Laws of Arkansas shall not be construed so as to interfere with the operation of the laws governing marriage enacted by any of the civilized tribes, nor to confer any authority upon any officer of said court to unite a citizen of the United States in marriage with a member of any of the civilized nations until the preliminaries to such marriage shall have first been arranged according to the laws of the nation of wh.ch said Indian person is a member." (26 Stat. 98, sec. 38.)

By chapter 52 of Mansfield's Digest, so extended and put in force, it is provided that:

"The circuit court shall have power to dissolve and set aside a marriage contract, not only from bed and board, but from the bonds of matrimony. * * *" (Section 2556.)

And chapter 102 thereof prescribes who are competent to contract marriages and solemnize the same, and provides for keeping a record thereof.

By Act Cong. June 7, 1897, c. 3, 30 Stat. 62, 83, it is provided:

"The laws of the United States and the State of Arkansas in force in the territory shall apply to all persons therein irrespective of race."

And Act June 28, 1898, c. 517, 30 Stat. 495, 504, provides for the abolition of tribal courts, and that:

"The laws of the various tribes or nations of Indians shall not be enforced at law or in equity by the courts of the United States in the Indian Territory." (Section 26.)

By the Seminole Agreement approved by Act Cong. July 1, 1898, c. 542, 30 Stat. 567, it was provided:

"The United States courts now existing, or that may hereafter be created, in Indian Territory, shall have exclusive jurisdiction of all controversies growing out of the title, ownership, occupation, or use of real estate owned by the Seminoles, and to try all persons charged with homicide, embezzlement, bribery and embracery hereafter committed in the Seminole country, without reference to race or citizenship of the persons charged with such crime; and any citizen or officer of said nation charged with any such crime, if convicted, shall be punished as if he were a citizen or officer of the United States, and the courts of said nation shall retain all the jurisdiction which they now have, except as herein transferred to the courts of the United States. When this agreement is ratified by the Seminole Nation and the United States the same shall serve to repeal all the provisions of the Act of Congress approved June seventh, eighteen hundred and ninety-seven, in any manner affecting the proceedings of the General Council of the Seminole Nation." (30 Stat. 569.)

By Act Cong. April 28, 1904, c. 1824, 33 Stat. 573, providing for the appointment of additional United States judges in the Indian Territory, it is provided:

"All the laws of Arkansas heretofore put in force in the Indian Territory are hereby continued and extended in their operation, so as to embrace all persons and estates in said territory, whether Indian, freedmen, or otherwise.    *    *    *"

A jury was impaneled, which returned special findings in response to questions submitted by the court as follows:

"(1) Had Kintah Palmer separated and divorced himself from Lowina Palmer according to the ·Seminole laws and customs prior to April 28, 1904?    A. No.

"(2) Did Thomas Palmer secure the execution of a deed dated June 3, 1912, from Pheney Palmer, upon false representations made by Thomas Palmer to Pheney Palmer at the time, and which representations were at the time known by Thomas Palmer to be false, and made for the purpose of deceiving Pheney Palmer, and upon which Pheney Palmer relied, and would not have executed said deed except for said representations, if any; in other words, did Thomas Palmer secure the execution of the deed in question from Pheney Palmer by false and fraudulent representations?    A. No.

"(3)   Did the defendants C. B. Hyde and M. P. Mathis have any notice as to any false or fraudulent representations, if any were made, by Thomas Palmer to Pheney Palmer at the date of the execution of the deed? A. No.

"(4)   Are the defendants C. B. Hyde and M. P. Mathis bona fide purchasers of the land in controversy, in good faith, for a valuable consideration, without notice of any claims of the plaintiff?    A. Yes."

The court adopted the findings of the jury and rendered the following judgment:

"That subsequent to the act creating additional judges in the Indian Territory and for other purposes, effective

April 28, 1904, the laws of Arkansas as contained in Mansfield's Digest, theretofore put in force in the Indian Territory relative to marriage and divorce, became binding upon the members of the Seminole Tribe of Indians.

"The court concludes as a matter of law that, Kintah Palmer not having divorced himself from Lowina Palmer prior to April 28, 1904, and, not having been divorced in the manner as provided in Manfield's Digest in force in said Indian Territory, Kintah Palmer was not a person legally authorized to enter into a common-law marriage, for the reason he had a living wife, and he was not divorced at the time he commenced to live with Pheney Palmer or Pheney Bowlegs.

"The court concludes that so far as the Indian people, friends and relatives of the deceased, are concerned, he was to all intents and purposes legally married to the plaintiff herein. While in their crude Indian life plaintiff was the wife of the deceased, and occupied that position socially and morally, and her position appeals to the sympathy of the court, yet as to property rights the court is not unmindful that, while it might be a hardship upon this plaintiff, there must be some place and some date upon which the Indian tribal customs and laws must yield to the laws of civilization, and, the succession of property being one of the sacred rights of our form of government, the court concludes that the plaintiff is not the lawful wife of the deceased, and for that reason acquires no interest in the land and property of the deceased upon his death, and judgment is rendered for the defendants."

Construing section 2 of the act of April 28, 1904, *supra*, continuing and extending in their operation, so as to embrace all persons and estates, whether Indian, freedman, or otherwise, the laws of Arkansas theretofore put in force in the Indian Territory, which included chapter 155 of Mansfield's Digest, relative to wills and testaments, this court, speaking through Mr. Chief Justice Kane, in

*Taylor v. Parker,* 33 Okla. 199, 126 Pac. 573 (affirmed by the federal Supreme Court in 235 U. S. 42, 35 Sup. Ct. 22, 59 L. Ed. 121), said:

"The effect of the act of Congress of April 28, 1904 (33 Stat. 573), was to make the laws of Arkansas theretofore put in force in the Indian Territory, applicable to another class of persons and estates, to wit, Indians and their property, in so far as it was alienable under the acts of Congress then bearing upon it. The extension of the law of wills enabled the Indian to devise all his alienable property by will made in accordance with the laws of the State of Arkansas, but did not operate to remove any of the restrictions theretofore placed upon lands of Indians by act of Congress."

In *Washington v. Miller,* 235 U. S. 422, 35 Sup. Ct. 119, 59 L. Ed. 295 (affirming 34 Okla. 259, 129 Pac. 58), the Supreme Court of the United States, while holding that the provisions of the act of April 28, 1904, above quoted, did not operate to repeal certain provisions of the Supplemental Creek Agreement as to the descent of allotted tribal lands, said:

"No doubt there was a purpose to extend the operation of the Arkansas laws in various ways, but we think it was not intended that they should supersede or displace special statutory provisions enacted by Congress with particular regard for the Indians whose affairs were peculiarly within its control. *Taylor v. Parker, ante,* 235 U. S. 42 [35 Sup. Ct. 22, 59 L. Ed. 121]. See, also, *In re Davis' Estate,* 32 Okla. 209 [122 Pac. 547]."

While it was not intended by said act to supplant or supersede any special act of Congress or provisions therein, yet the plain purpose and effect thereof was to abolish the general tribal laws of the Seminoles, if the act of June 28, 1898, *supra,* had not already accomplished such

purpose *(Heliker-Jarvis Seminole Co. v. Lincoln et al.,* 33 Okla. 425, 126 Pac. 723), and to substitute therefor the laws of Arkansas theretofore put in force, and which had for years governed all persons in the Indian Territory, save tribal citizens in their intercourse with each other.

In the Indian Territory, of which the Seminole Nation formed a part, prior to April 28, 1904, a marriage or divorce contracted or procured by Indian citizens in accordance with tribal laws or customs was valid. *James v. Adams,* 155 Pac. 1121 (not yet officially reported). But subsequent thereto members of the Five Civilized Tribes could lawfully contract marriages only in the manner recognized by the general laws in force in the Indian Territory prior to statehood and by the laws of this state thereafter. Nor after said date could there be any effectual dissolution of a marriage between such tribal citizens by mere compliance with the tribal customs or laws. Existing marriage contracts could only be dissolved by judgment or decree of a court of competent jurisdiction. The marriage of the plaintiff and Kintah Palmer in 1905 in accordance with the Seminole laws was therefore invalid, he at the time having a living, undivorced wife, and being incompetent to contract the same; nor could she have become his lawful wife before the dissolution of his marriage with Lowina.

Upon the erection of the state, members of the Seminole Tribe became citizens of Oklahoma, subject to the general laws of the state relative to marriage and divorce, since which time the validity of their marriage contracts and all rights consequent or arising therefrom have been dependent upon such laws. It was the apparent purpose

of plaintiff and Kintah. Palmer to contract a lawful marriage, to accomplish which they did all things deemed necessary according to their understanding of the requirements, and assumed the marriage relation innocently and in good faith, believing that they had complied with the law in this respect. They were recognized as husband and wife by their kinsmen, friends, and acquaintances, all of whom knew of their past domestic relations. They lived together in this manner for eight years, and for nearly a year after Kintah had been divorced from his former wife, and until his death, mutually agreeing, understanding, and believing that they were in law husband and wife. It is clear that their relations were matrimonial and never meretricious or knowingly unlawful.

The doctrine that a common-law marriage is valid in this state was established in *Re Love's Estate*, 42 Okla. 478, 142 Pac. 305, in which the question is exhaustively and learnedly discussed by Judge Brewer. In *Clark v. Burney*, 24 Okla. 455, 103 Pac. 598, Mr. Justice Williams, speaking for the court, said:

"It seems to be the rule, where common-law marriages are permissible, that, although no subsequent marriage ceremony is performed, the parties having previously, under the forms of law evidencing the contract of marriage, assumed that relation in good faith and innocent of any willful intention to commit wrong, believing that the contract of marriage was valid, and having continued that relation in good faith for a long period after it could have been legally assumed, the presumption arises that thereby they intended and meant marriage, mutually consenting to a contract of that character. *Williams v. State*, 44 Ala. 24; *Pool v. People*, 24 Colo. 510, 52 Pac. 1025, 65 Am. St. Rep. 245; *Gordon v. Gordon*, 141 Ill. 160, 30 N. E. 446, 21 L. R. A. 387, 33 Am. St. Rep. 294; *Cartright v. Mc-*

*Cown*, 121 Ill. 388, 12 N. E. 737, 2 Am. St. Rep. 105; *Harris et al. v. Harris et al.*, 85 Ky. 49, 2 S. W. 549; *Rose v. Rose*, 67 Mich. 619, 35 N. W. 802; *Vorhees v. Vorhees et al.*, 46 N. J. Eq. 411, 19 Atl. 172, 19 Am. St. Rep. 404, dissenting opinion by Judge Garrison; [*Collins v. Vorhees*] 47 N. J. Eq. 315, 20 Atl. 676, 14 L. R. A. 364, 24 Am. St. Rep. 412; *Pettit v. Pettit*, 105 App. Div. 312, 93 N. Y. Supp. 1001; *In re Reading Fire Ins. Co.*, 113 Pa. 204, 6 Atl. 60, 57 Am. Rep. 449; *Henry et al. v. Taylor*, 16 S. D. 424, 93 N. W. 641; *Spencer v. Pollock et al.*, 83 Wis. 215, 53 N. W. 490, 17 L. R. A. 848; *Williams v. Williams*, 46 Wis. 465, 1 N. W. 98, 32 Am. Rep. 722; *Cunninghams v. Cunninghams*, 2 Dow. 483, 3 House of Lords, 483, 3 Eng. Rep. (Full Reprint) 939."

There was no fraud or misrepresentation on the part of Thomas Palmer inducing the execution of a deed by plaintiff to him. There was, and could have been, no mistake as to the facts in regard to plaintiff's relation with Kintah Palmer, or as to his marriage to Lowina and its dissolution in 1911, concerning which she knew every detail. But there was doubt in the minds of both plaintiff and Thomas Palmer as to her marital status growing out of such relations, and her right under the law, by reason thereof, to share as widow in the distribution of the estate. To set at rest their doubt upon these questions, they together sought the advice of the attorneys employed by the federal government to represent the Seminole Indians, and were informed that under the law plaintiff was never the wife of Kintah, and therefore was not entitled to share in his allotment. Relying upon such advice, plaintiff, as Pheney Bowlegs, the name she bore at the time of her marriage to Kintah Palmer, executed the deed to Thomas Palmer. She being a full-blood Indian, it was evidently thought essential to the validity of her deed that the same be approved in com-

pliance with the provision of Act Cong. May 27, 1908, c. 199, 35 Stat. 312; and to this end plaintiff presented to the proper court her sworn petition for the approval thereof, stating therein:

"That at the time of the death of Kintah Palmer this petitioner was living with said deceased, and does not claim to have been his legal wife, and does not claim any interest in his estate; but one of the heirs of said deceased has this day bargained with the petitioner for a deed upon said lands and premises, in order that there may never be any question of this petitioner making any claim to any part of said estate, and this petitioner has, in consideration of the sum of $100, this day made, executed, and delivered to Thomas Palmer, one of the heirs of Kintah Palmer, deceased, her deed, conveying to him all her interest in said lands."

The deed was thereupon approved by the court, the order of approval, which was recorded with the deed in the office of the register of deeds, containing a recital of the statements made in the petition above set forth. In *Hurd v. Hall,* 12 Wis. 125, it is said:

"A mistake of law happens, when a party, having full knowledge of the facts, comes to an erroneous conclusion as to their legal effect. It is a mistaken opinion or inference, arising from an imperfect or incorrect exercise of the judgment, upon facts as they really are; and, like a correct opinion, which is law, necessarily pre-supposes that the person forming it is in full possession of them."

There being no undue influence, misrepresentation, or fraud, and no mistake of fact inducing or in any way connected with the execution or delivery of the deed of June 3, 1912, by plaintiff to Thomas Palmer, but merely a mistaken view of the law as to plaintiff's rights under her known status, it is clear that under the settled doctrine in

this jurisdiction she is not entitled to the relief she seeks, for the reason that such mistake of law does not constitute grounds for rescission or the cancellation of said deed. *Campbell v. Newman,* 51 Okla. 121, 151 Pac. 602.

It follows that the judgment of the trial court should be affirmed.

By the Court: It is so ordered.