**FOREST OIL CORPORATION, Appellant,**

v.

**CORPORATION COMMISSION OF OKLAHOMA, Appellees.**

Nos. 72737, 72757.

Supreme Court of Oklahoma.

July 3, 1990.

As Amended Feb. 4, 1991.

Dissenting Opinion Feb. 5, 1991.

Rehearing Denied Feb. 5 and April 2, 1991.

776

Laurence M. Huffman, Mark A. Moore, Oklahoma City, for appellant Forest Oil Corp.

Richard K. Books, Janis W. Preslar, Oklahoma City, for appellant Mesa Midcontinent Ltd. Partnership.

Charles A. Adams, Oklahoma City, for appellee Corp. Com'n of Oklahoma.

Terry W. Tippens, Harry H. Selph, Thomas J. Enis, David L. Kearney, Oklahoma City, John L. Arrington, Jr., Thomas J. Kirby, Tulsa, William H. Huffman, Oklahoma City, for appellee Oklahoma Natural Gas Co.

KAUGER, Justice.

The issues presented are: 1) whether 52 O.S.Supp.1988 § 87.2[1] applies to a request for clarification of a Corporation Commission order filed pursuant to 52 O.S.1981 § 112;[2] 2) if a party responds to an application filed before the Corporation Commission by requesting relief not asked for in the original application, whether notice must be given purusant to 52 O.S.1981 § 112; and if so, whether, for notification purposes, reliance upon a list provided by the party responsible for distribution of proceeds from the sale of oil and gas is proper; 3) whether Order No. 335027 is a clarification rather than a modification order; 4) whether, pursuant to OCC–OGR 2–105(d),[3] underage accumulated because

1. Title 52 O.S.Supp.1988 § 87.2 provides in pertinent part:
 "A. Except as provided in subsection B of this section, only those persons, or the duly authorized agent, representative or attorney of those persons, who are mineral owners or owners of the right to drill a well for oil and gas on the lands embraced within the subject area of an application or the owners of correlative rights within the common source of supply or supplies embraced within an application to the extent such owners are directly affected by such application, shall be proper parties to:
 1. protest any application to establish, reestablish, or reform a spacing unit,
 2. protest any application requesting authority for an additional well or wells within an established spacing unit brought pursuant to the provisions of paragraph (a) or (d) of Section 87.1 of Title 52 of the Oklahoma Statutes, or
 3. present testimony or evidence at any hearing arising thereunder or relating thereto.
 B. No other person shall be entitled to notice of such proceeding or shall be entitled to appear as a party of record therein, except that the Corporation Commission may permit persons other than those specified in subsection A of this section leave to intervene in a proceeding upon a finding, based upon clear and convincing evidence, that such person has a substantial right intended to be protected by Section 87.1 of Title 52 of the Oklahoma Statutes which may adversely be affected by the outcome of such proceeding. Any finding required by this section shall be made by the Corporation Commission, sitting en banc, within ten (10) days of the filing of a motion to intervene by such person and such proceeding shall be stayed during such period...."

2. Title 52 O.S.1981 § 112 provides in pertinent part:
 "Any person affected by any legislative or administrative order of the Commission shall have the right at any time to apply to the Commission to repeal, amend, modify, or supplement the same. Such application shall be in writing and shall be heard as expeditiously as possible after notice of the hearing thereon shall have been given in the manner provided by Section 14 of this act...."
 The reference in § 112 is to 52 O.S.1981 § 97 which provides in pertinent part:
 "The Commission ... shall have jurisdiction to make any and all orders, rules and regulations authorized and/or provided for in Sections 1 to 13 of this act, inclusive, provided that said orders, rules, and regulations shall be made only after a hearing before the Commission of which the Commission shall have given at least ten (10) days' notice, by one publication of such notice in some newspaper of general circulation printed in Oklahoma City, Oklahoma ..."
 The express language of § 97 provides for publication notice only. However, we have held that this statutorily-prescribed notice form is inadequate to meet the minimum due process standards if there are holders of producing mineral interests whose identities are known or could be ascertained with due diligence. *Harry R. Carlile Trust v. Cotton Petroleum Corp.*, 732 P.2d 438, 443 (Okla.1986), *cert. denied*, 483 U.S. 1007, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987) and 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 764 (1987).

3. At the time this cause was filed OCC–OCR 2–105(d) (1987) provided:
 "Failure or refusal of the purchaser to run or take the allowable shall be grounds for reinstatement of any underage accumulated by reason of such failure or refusal. Underages may be accumulated until they are balanced by equal runs in excess of current allowables."
 Rules for reinstatement of cancelled underage for oil wells and unallocated gas well are now found in OCC–OGR 2–111 (1989). OCC–OGR 2–111 provides in pertinent part:
 "... B. Unallocated Gas Well:
 1. With respect to any unallocated gas well, the underage for the well existing at the

of failure of the purchaser to take gas from an unallocated gas well may be applied to adjust overage produced; and 5) whether a constitutional attack may be launched vicariously. We find that: 1) 52 O.S. Supp.1988 § 87.2 does not apply to a request for clarification of a Corporation Commission order filed pursuant to 52 O.S. 1981 § 112; 2) if in response to an application filed before the Corporation Commission, a party asks for relief not requested in the original application, notice must be given pursuant to 52 O.S.1981 § 112, and that notice was properly given in the instant cause; 3) Order No. 335027 is a clarification rather than a modification order. In providing for a single unit allowable, it does not alter the location exception, increased density, or hardship orders; 4) pursuant to OCC–OGR 2–105(d) (1987), underage accumulated because of failure of the purchaser to take gas from an unallocated gas well may be applied to adjust overage produced; and 5) there are no countervailing policies to justify vicarious assertion of constitutional rights. The Corporation Commission order is overruled in so far as it refuses to excuse any overproduction. In *Chamberlin v. Chamberlin,* 720 P.2d 721, 723–24 (Okla.1986), this Court found that "(*a*) *deficient record may not be supplemented on rehearing.*" (Emphasis in text.) In the last paragraph on page 3 of the Justice Lavender's dissent, he clearly relies upon materials that were not before this tribunal on appeal. The record did not contain any reference to "notice of OCC's intent for making the change" to rule 2– 111. Reliance upon such materials is inap-

propriate. These materials were submitted for the first time in the Corporation Commission's petition for rehearing. Justice Lavender's statement on page 2 that "the record is void of any evidence that Rule 2–105(d) has ever been used for unallocated gas wells" is not supported by the record.[4]

## FACTS

This cause concerns interpretation of the maximum permitted production for two gas wells established by three orders issued by the Oklahoma Corporation Commission (Corporation Commission).[5] The orders cover an irregular 1,000 acre drilling and spacing unit (Belcher Unit) consisting of the E/2 E/2 of Section 22, all of Section 23, the N/2 N/2 of Section 26, and the NE/4 NE/4 of Section 27, all in Township 5N, Range 11W, Caddo County, Oklahoma. Two of the orders concern the Belcher No. 2 (increased density well) and were issued on April 20, 1983. Order No. 237086 provides for the drilling of the increased density well in the Belcher Unit. Order No. 237085 provides for the Belcher No. 2 to be drilled off-pattern, and assesses a twenty-five percent penalty against production. The third order relates to the Belcher No. 1 and was issued on January 26, 1984. Order No. 252636 (hardship order) recognizes the Belcher No. 1 as a hardship well. The cause turns on whether the hardship well order created a separate rate of production for the Belcher No. 1.

The original well in the Belcher Unit, the Belcher No. 1, was completed in 1973. The increased density well, the Belcher No. 2,

---

end of the proration period shall be automatically cancelled.

 2. The operator of an unallocated gas well may apply for reinstatement of cancelled underage, provided that reinstated cancelled underage shall not exceed twenty-five percent of the cancelled underage for the proration period. The procedure for applying for reinstatement of cancelled underage is described in paragraph C, below.

 3. Inability to sell gas during the proration period shall be grounds for reinstatement of cancelled underage, except in situations where the operator failed to comply with applicable well testing and reporting requirements of the Commission...."

**4.** See, R. 1732–1734—In which the Manager of the Corporation Commission's Technical Department testifies that Rule 2–105(d) is contained under the heading "Determination of Allowables" and that other rules under the heading relate to both oil and gas. Testimony from Forest's witness supporting a finding that Rule 2–105(d) relates to the determination of underages and overages in an unallocated gas well are found at the following record cites: R. 1602, R. 1607, R. 1609, R. 1611, R. 1612, R. 1633, R. 1641, R. 1671, and R. 1700.

**5.** This cause is an outgrowth of a take-or-pay action filed in District Court. As an anciliary action, this cause may affect the amount of damages Forest is entitled to receive.

was completed in 1983 as an off-pattern well. As a result of a work-over operation, the Belcher No. 1 began to experience down-hole problems. After application by the appellant, Forest Oil Corporation (Forest),[6] the Corporation Commission granted the No. 1 well hardship status as a distressed well on January 26, 1984. In 1987, the Corporation Commission staff questioned the continued need to classify the Belcher No. 1 as a hardship well. Issues were also raised concerning the production allowable for the Belcher Unit.

After months of negotiation concerning production from the Belcher Unit, the technical department of the Corporation Commission wrote a letter to Forest on December 1, 1987. The letter stated that the Corporation Commission would support a maximum permitted production from the Belcher No. 1 of 2 million cubic feet per day (MCDF). The letter also indicated that if Forest did not take action to resolve the controversy in the Belcher Unit that production from the unit would be curtailed to 10% of its allowable to adjust for overproduction. In response, Forest filed an application with the Corporation Commission seeking relief for the Belcher No. 1. Forest requested that: 1) the Belcher No. 1 be given a permitted production allowable of 2 MCFD; 2) the well be excused from testing requirements; and 3) the current allowable be adjusted to eliminate or excuse any overage accumulated by the Belcher Unit. The appellee, Oklahoma Natural Gas Company (ONG),[7] responded to Forest's application on January 4, 1988. ONG requested that the Corporation Commission clarify the three orders covering the Belcher Unit and that production from the Belcher Unit be curtailed to make-up overage established as of December 31, 1987.

When the hearing commenced on April 11, 1988, Forest moved to exclude ONG pursuant to 52 O.S.Supp.1988 § 87.2. The hearing officer sustained Forest's motion. On appeal, the Corporation Commission *en banc* found that § 87.2 was inapplicable, and denied Forest's application to exclude ONG. Forest filed a second motion to dismiss on May 20, 1988. Forest asserted that ONG sought to litigate a private contractual dispute before the Corporation Commission. On May 21, 1988, because the question at issue was the production allowable for the Belcher Unit, the motion was denied. The hearing on the merits began on June 20, 1988. The cause was again heard on July 7–8, and August 1–3, 1988. On September 21, 1988, the hearing officer recommended that Forest's application be granted. ONG appealed to the Corporation Commission *en banc*. The cause was argued to the Commission *en banc* on November 16, 1988. On February 3, 1989, the Corporation Commission issued Order No. 335027 (clarification order), finding that the hardship order issued on January 26, 1984 provided for a unit allowable to be established by the best-well test.[8]

6. Mesa Midcontinent Limited Partnership (Mesa), is the predecessor in interest of Tenneco Oil Company which was named as respondent in the Corporation Commission and supported Forest's application. Mesa is also participating in the instant cause as an appellant. Because Forest and Mesa take similar positions on the issues, the appellants are referred to collectively as "Forest."

7. The Oklahomna Corporation Commission (Corporation Commission) is also an appellant in the instant cause. Because ONG and the Corporation Commission take similar positions on the issues, the appellants are referred to collectively as "ONG."

8. OCC–OGR 2–110 (1987) provides in pertinent part:
 "a. Except as otherwise provided by order or rule of the Commission, the allowable production for permitted wells within a drilling and spacing unit shall be determined as follows:
 ... 2. Permitted wells of the same classification for allowable purposes shall share a single well allowable.
 3. If two or more wells within the drilling and spacing unit are classified as gas wells, then the shared single well allowable shall be based on the greater of:
 (a) A minimum allowable; or
 (b) What would have been the allowable for the best well in the drilling and spacing unit, but for operation of this rule...."
OCC–OGR 2–110 (1989) still provides for a shared single unit allowable between two wells of the same classification. The provision for determination of that allowable now provides in pertinent part:
 "B. If two or more wells in a single drilling and spacing unit are classified as gas wells for allowable purposes, the shared single allow-

The order also provided that if the capacity production from the Belcher No. 1 exceeded the established unit allowable, the Belcher Unit's permitted production allowable would be production from the hardship well. Under those circumstances, any production from the Belcher No. 2 would be treated as overage. The Corporation Commission excused the Belcher No. 1 from testing requirements, but refused to excuse the 1978 unit overage of 105,918 MCF. The Corporation Commission's order is overruled only in so far as it refused to balance overage produced against prior accumulated underages.

## I

TITLE 52 O.S.Supp.1988 § 87.2 DOES NOT APPLY TO A REQUEST FOR CLARIFICATION OF A CORPORATION COMMISSION ORDER FILED PURSUANT TO 52 O.S.1981 § 112.

■ Forest asserts that 52 O.S.Supp. 1988 § 87.2 precludes ONG from participating in this case. ONG argues that § 87.2 does not apply to an application for clarification of a Corporation Commission order filed pursuant to 52 O.S.1981 § 112. ONG also alleges that if § 87.2 precludes purchasers from requesting clarification of hardship, location exception, or increased density orders, application of the statute to the instant cause is retrospective, depriving ONG of a vested right.

Forest petitioned the Corporation Commission for a permitted production allowable of 2 MCFD for the Belcher No. 1. Forest also asked that the Belcher No. 1 be excused from future testing requirements, and that the current allowable be adjusted to eliminate or excuse any overage. In response, ONG requested that the Corporation Commission clarify the location exception and increased density orders relating to the Belcher No. 2, and the hardship

able for the unit shall be determined by the greater of:
 1. a minimum allowable; or
 2. a normal allowable based on the wellhead absolute open flow potential of the best well in the drilling and spacing unit producing from the same common source of supply...."

order covering the Belcher No. 1. ONG also asked that production be curtailed from the Belcher Unit to make up overage established as of December 31, 1987.

Under § 112, any person affected by a Corporation Commission order has standing to apply to the Commission for relief. Because of its contractual status vis a vis Forest, ONG is affected by the prior orders covering the Belcher Unit. ONG is under contract with Forest to either take or pay for gas produced from the Belcher Unit. Section 87.2 does not restrict ONG's ability to apply for relief. Section 87.2 enumerates those parties entitled to protest applications to establish, reestablish, or reform drilling and spacing units; to protest applications for increased-density wells; or to present evidence at hearings arising under or relating to those protests. The plain language of § 87.2 prohibits those who are not mineral owners, owners of the right to drill a well, or the owners of correlative rights within the common source of supply from protesting a cause *arising under or related to either spacing or increased well density. The statutory language does not indicate that the Legislature intended to restrict participation in causes which do not affect spacing size, shape, or well density.* The presumption is that the Legislature intends what it expresses and nothing more.[9] Neither party seeks to alter either the spacing or well density of the Belcher Unit. Both parties request relief affecting allowable production. Because ONG does not seek establishment or modification of either the size of the spacing unit or the number of wells to be located within the Belcher Unit, its participation is not prohibited by § 87.2. It may participate in the cause as a party "affected" by the orders covering the Belcher Unit.

■ We have held that § 112 gives the Corporation Commission authority to clari-

**9.** *U.S.I.F. Norman Corp. v. Oklahoma Tax Comm'n,* 534 P.2d 1298, 1301 (Okla.1974); *Oliver v. Oklahoma Alcoholic Beverage Control Bd.,* 359 P.2d 183, 189 (Okla.1961); *Stemmons, Inc. v. Universal C.I.T. Credit Corp.,* 301 P.2d 212, 216 (Okla.1956).

fy its orders.[10] The power to clarify a previous order is continuous in nature, and flows from the entry of the original order.[11] Section 112 provides that any person "affected by" a Corporation Commission order has the right to request the order's amendment, modification, or a supplement to the order. Absent evidence that the Legislature intended a special or technical definition, words used in a statute are given their ordinary and common meaning.[12] In its legal sense "affect" means to act injuriously upon persons or estates.[13] It may also mean to concern, change, increase or diminish.[14] In *United States v. Public Util. Comm'n*, 151 F.2d 609, 613 (D.C.Cir.1945), the District of Columbia Court gave a broad meaning to the word "affected" used in two statutes allowing consumers to challenge Public Utility Commission rulings. The court found that the term had been chosen to expand the privilege of complaint. The code language at issue in *Public Util. Comm'n* is almost identical to that of § 112.[15] Both the provisions under consideration in *Public Util. Comm'n* and § 112 provide that any person "affected by" a ruling of the respective agency may apply for relief. Like the language in *Public Util. Comm'n*, § 112's reference to parties "affected by" orders of the Corporation Commission must be given a broad meaning to encompass those parties whose positions are altered by the regulatory commission's orders.

■ ONG contracted with Forest to either take or pay for gas from the Belcher Unit. ONG's financial obligation to Forest is related to the amount of gas which it may produce. Because the allowable established by the Corporation Commission's prior orders regulates the amount of gas ONG must either take or pay for, ONG's position is "affected by" the orders within the meaning of § 112.

■ If the Legislature had intended for § 87.2 to preclude non-owners from requesting clarification of Corporation Commission orders, the statute would not apply to this case. Forest filed the instant cause on December 23, 1987. ONG answered on January 4, 1988. Before the hearing on the merits, the Legislature passed § 87.2 with an effective date of April 1, 1988. The general rule is that statutes are intended to operate prospectively unless the Legislature clearly expresses a contrary intent.[16] If doubt exists, it must be resolved against a retroactive effect.[17] However, remedial or procedural statutes which do

**10.** *Tenneco Oil Co. v. Oklahoma Corp. Comm'n*, 775 P.2d 296, 297–98 (Okla.1989); *Cabot Carbon Co. v. Phillips Petroleum Co.*, 287 P.2d 675, 679 (Okla.1955); R. Musser, "1989 Oklahoma Supreme Court and Court of Appeals Opinions Pertaining to Oil and Gas and Real Property," 61 O.B.J. 781 (1990); Note, "Interpretation of Corporation Commission Orders: The Dichotomous Court/Agency Jurisdiction," 8 Okla. City U.L. Rev. 311–312 (1983); D. Pray, "The Oklahoma Well Spacing Act & Its Interpretation," 36 O.B.J. 487, 498 (1965).

**11.** *Nilsen v. Ports of Call Oil Co.*, 711 P.2d 98, 102–03 (Okla.1985).

**12.** *Matter of Income Tax Protest*, 751 P.2d 1070, 1073 (Okla.1988); *Hess v. Excise Bd.*, 698 P.2d 930, 932 (Okla.1985); *Loffland Bros. Equip. v. White*, 689 P.2d 311, 314 (Okla.1984).

**13.** *In re Davis' Estate*, 32 Okl. 209, 122 P. 547, 551 (1912).

**14.** *Gaunt v. Alabama Bound Oil & Gas Co.*, 281 F. 653, 656, 23 A.L.R. 1279, 1282–83 (8th Cir. 1922); *McCormick v. Central Coal & Coke Co.*, 117 Kan. 686, 232 P. 1071, 1075 (1925).

**15.** D.C.Code (1940) § 43–704 provides in pertinent part:
"... Any public utility or any other person or corporation affected by any final order or decision of the commission may ... file with the commission an application in writing requesting a reconsideration .."
D.C.Code (1940) § 43–705 provides in pertinent part:
"... Any public utility or any other person or corporation affected by any final order or decision of the Commission ... may ... file with the clerk of the District Court of the United States for the District of Columbia a petition of appeal ..."

**16.** *Matter of McNeely*, 734 P.2d 1294, 1296 (Okla. 1987); *Seal v. Corporation Comm'n*, 725 P.2d 278, 294 (Okla.1986), cert. denied, 479 U.S. 1073, 107 S.Ct. 1265, 94 L.Ed.2d 126 (1987); *Hammons v. Muskogee Medical Center Auth.*, 697 P.2d 539, 542 (Okla.1985).

**17.** *Teel v. Public Serv. Co.*, 767 P.2d 391, 399 (Okla.1987); *Wilson v. State ex rel. Oklahoma Tax Comm'n*, 594 P.2d 1210, 1212 (Okla.1979).

not create, enlarge, diminish, or destroy vested rights may operate retrospectively,[18] and apply to pending actions or proceedings.[19] A purely procedural change is one that affects the remedy only, and not the right.[20] Application of § 87.2 to the instant cause would alter more than the potential remedy, it would preclude ONG from participating in the action. Statutes which act as a complete bar to assertion of an interest affect rights rather than just remedies.[21]

## II

IF IN RESPONSE TO AN APPLICATION FILED BEFORE THE CORPORATION COMMISSION, A PARTY ASKS FOR RELIEF NOT REQUESTED IN THE ORIGINAL APPLICATION, NOTICE MUST BE GIVEN PURSUANT TO 12 O.S.1981 § 112. IN THE EXERCISE OF DUE DILIGENCE TO GIVE NOTICE TO THOSE ENTITLED TO SHARE IN THE PROCEEDS FROM OIL OR GAS PRODUCTION, RELIANCE UPON A LIST PROVIDED BY THE PARTY RESPONSIBLE FOR DISTRIBUTION OF PROCEEDS FROM THE SALE OF OIL AND GAS IS PROPER.

### A.

### NOTICE REQUIREMENT.

■ Forest asserts that in order to vest the Corporation Commission with jurisdiction to clarify a previously entered order, the notice requirements of § 112 must be met. It also argues that the notice given by ONG was deficient. ONG contends that notice is not required when the relief sought is a clarification of prior orders rather than a modification or change. However, it alleges that if notice is required, the notice given was adequate.

Although establishment of an additional permitted production allowable for the Belcher No. 1 might have some impact on the allowable established for the Belcher No. 2, Forest's prayer for relief concerns only the No. 1 well.[22] ONG's response requests interpretation of all three orders covering the Belcher Unit—two of which relate specifically to the No. 2 well. If the issues raised in the original application are changed by an intervening application, the notice required by § 112 must be given to vest the Corporation Commission with jurisdiction to hear the new issue.[23] Because the response asks for interpretation of orders not presented by the original application, ONG was required to give the statutorily mandated notice.

ONG's reliance upon *Cabot Carbon Co. v. Phillips Petroleum Co.*, 287 P.2d 675, 679 (Okla.1955) and *Nilsen v. Ports of Call Oil Co.*, 711 P.2d 98, 102 (Okla.1985) for the proposition that notice is not required when a party seeks to clarify rather than to supplement or to modify a Corporation Commission order is misplaced. In *Cabot Carbon*, the opinion notes that due notice of the application to clarify the order was given. The issue of notice is neither raised nor discussed in *Nilsen*.

### B.

### NOTICE GIVEN WAS ADEQUATE.

■ When ONG filed the response in the instant cause, it gave personal notice to the same parties notified by Forest—those

---

18. *Welch v. Armer*, 776 P.2d 847, 850 (Okla. 1989).

19. *Gray v. Gray*, 459 P.2d 181, 186 (Okla.1969).

20. *Trinity Broadcasting Corp. v. Leeco Oil Co.*, 692 P.2d 1364, 1367 (Okla.1984); *Fleming v. Baptist Gen. Convention*, 742 P.2d 1087, 1103 (Okla.1987) (Kauger, J., concurring.).

21. *Trinity Broadcasting Corp. v. Leeco Oil Co.*, see note 20 at 1367–68, supra.

22. Forest's application does suggest that a separate allowable may be established for the Belcher No. 2.

23. *Carpenter v. Powel Briscoe, Inc.*, 380 P.2d 245, 247–48 (Okla.1963). See also, *Crews v. Shell Oil Co.*, 406 P.2d 482, 487 (Okla.1965) and *Carter Oil Co. v. State*, 205 Okl. 374, 238 P.2d 300, 303 (1951), in which we relied upon 52 O.S.1981 § 112, note 2, supra, and found that the Corporation Commission was without power or authority to review and modify a final order, establishing a well spacing unit, without first giving statutory notice to all interest parties.

with an interest in the Belcher No. 1. Because the relief requested by ONG involved both wells in the Belcher Unit, Forest objected. Forest argued that ONG was required to give notice to all parties entitled to share in the unit's production. Although ONG continued to maintain that notice was not required for clarification of a Corporation Commission order, it filed a motion to produce on May 18, 1988. The motion requested that Forest provide a current list of the names and addresses of parties entitled to share in production from the Belcher Unit. ONG sought production from Forest, because Forest is the operator of the wells in the Belcher Unit. Forest is responsible for the payment of proceeds from both wells. On May 31, 1988, the Commission *en banc* sustained ONG's motion. On June 3, 1988, ONG mailed all parties listed in Forest's records a copy of the Notice and Order setting the cause for hearing on June 20–22, 1988, and a copy of ONG's response. ONG published notice of the hearing on June 22, and 23, 1988, in Caddo and Oklahoma counties, respectively.

When Forest produced its current list of names and addresses of those parties entitled to share in production from the Belcher Unit, it stated that the list had not been updated by a title search. ONG relied upon the list provided. It did not conduct an independent search of county records. The list provided by Forest contained no address for four identified interest owners. Although ONG made no effort to find addresses for these four individuals, it did give publication notice.[24] No party appeared in the cause as a result of the notice given by ONG. Forest is the only party which asserts that notice was not properly given. Forest's assertion is premised on an argument that because ONG did not conduct an independent search of the county land records, it did not exercise due diligence in the notification process.

■ Although the express language of 52 O.S.1981 § 97 provides for publication notice only, we held in *Harry R. Carlile Trust v. Cotton Petroleum Corp.*, 732 P.2d 438, 443 (Okla.1986), *cert. denied*, 483 U.S. 1007, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1987) and 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 764 (1987), that this statutorily-prescribed notice form is inadequate to meet minimum due process standards if there are holders of producing mineral interests whose identities are known or could be ascertained with due diligence. Resort to publication service is constitutionally permissible only when all other means of giving notice are unavailable. Courts may not presume publication service alone to be constitutionally valid when the judgment roll or record of an administrative proceeding fails to show that the means of imparting better notice were diligently pursued but proved unavailable.[25]

For service by publication to be effective, this Court has consistly required due diligence in giving notice of proceedings to persons whose rights could be adversely affected.[26] One procedure sanctioned as evidence of a diligent search includes the perusal of official records. However, we have recognized that "due diligence" is a "relative term lacking a fixed content."[27] Therefore, what constitutes "due diligence" is a matter of judicial determination on a case by case basis.[28] Here, ONG gave notice to all parties listed in Forest's records as entitled to production payments. An affidavit of nonmailing was filed to

**24.** Two notices were returned to ONG. One letter was remailed using a street address instead of a post office box. This letter was not returned. A second letter returned for insufficient address was remailed with the addition of the province name to an address in Canada. This notice was again returned.

**25.** *Harry R. Carlile Trust v. Cotton Petroleum Corp.*, see note 2 at 444, supra.

**26.** *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed.

865, 873 (1950); *Cravens v. Corporation Comm'n*, 613 P.2d 442, 444 (Okla.1980), *cert. denied* 450 U.S. 964, 101 S.Ct. 1479, 67 L.Ed.2d 613 (1981).

**27.** *Bomford v. Socony Oil Co.*, 440 P.2d 713, 718 (Okla.1968).

**28.** J. Dancy & V. Dancy, "Regulation of the Oil & Gas Industry by the Oklahoma Corporation Commission," 21 Tulsa L.J. 613, 639 (1986).

show the parties whose addresses were unavailable. These addresses were not included in Forest's "pay list," and Forest does not assert that the names and addresses of any of the parties who did not receive notification by mail are ascertainable from a source independent of its list of current payees. There was also testimony that the list provided by Forest was compared to a title opinion completed on October 8, 1987—less than three months before the instant cause was filed.[29]

As the entity responsible for making payments to those parties with an interest in the Belcher Unit, Forest's records must be accurate. Title 52 O.S.Supp.1985 § 540[30] requires that distribution to those entitled to proceeds from the sale of oil or gas shall be paid within six months after the first sale. Once an initial payment is made, payments are required no later than sixty days after the end of a calendar month in which production is sold. The list of those entitled to receive proceeds from the Belcher Unit was provided to ONG on June 2, 1988. This cause was filed in December of 1987. Because of § 540's requirement that proceeds be distributed within sixty days of the sale of oil or gas products, we can assume that any ownership changes which occurred after the suit was filed had been made to Forest's distribution list.

ONG relied upon a title opinion issued less than three months before Forest filed its application. Additionally, ONG had the benefit of a list of parties entitled to share in production from the unit. Under these circumstances, the burden of due diligence was met.

### III

ORDER NO. 335027 IS A CLARIFICATION RATHER THAN A MODIFICATION ORDER. IN PROVIDING FOR A SINGLE UNIT ALLOWABLE, IT DOES NOT ALTER THE LOCATION EXCEPTION, INCREASED DENSITY, OR HARDSHIP ORDERS.

Forest attacks Order No. 335027 on multiple grounds, the efficacy of which depends upon whether Order No. 335027 is a modification or merely a clarification of the prior orders covering the Belcher Unit. Forest asserts that, in issuing the order, the Corporation Commission: 1) mischaracterized the issue and allowed a collateral attack on prior Corporation Commission orders in violation of 52 O.S.1981 § 111;[31] 2) erroneously applied OCC–OGR 2–110 to establish a single allowable for the Belcher Unit; 3) applied OCC–OGR 2–110 in a manner which discriminates against interest owners in the Belcher No. 2; 4) gave retrospective application to a modification order which may be applied prospectively only; and 5) issued an order affecting an increased density well without finding that the order is necessary to prevent waste or protect correlative rights. ONG argues

---

**29.** The title opinion contained nine names not included in the list provided by Forest. Upon inquiry, ONG determined that all nine parties listed in the title opinion had either sold their interest or were deceased.

**30.** Title 52 O.S.Supp.1985 § 540 provides in pertinent part:

"A. The proceeds derived from the sale of oil or gas production from any oil or gas well shall be paid to persons legally entitled thereto, commencing no later than six (6) months after the date of first sale, and thereafter no later than sixty (60) days after the end of the calendar month within which subsequent production is sold. Such payment is to be made to persons entitled thereto by the first purchasers of such production.... The first purchaser shall be exempt from the provisions of this subsection and the owner of the right to drill and to produce under an oil and gas lease or force pooling order shall be substituted for the first purchaser therein where the owner and purchaser have entered into arrangements where the proceeds are paid by the purchaser to the owner who assumes the responsibility of paying the proceeds to persons legally entitled thereto ...."

Section 540 was amended effective July 1, 1989. However, the quoted portion of the statute remains unchanged.

**31.** Title 52 O.S.1981 § 111 provides in pertinent part:

"No collateral attack shall be allowed upon orders, rules and regulations of the Commission made hereunder, but the sole method of reviewing such orders and inquiring into and determining their validity, justness, reasonableness or correctness shall be by appeal from such orders, rules or regulations to the Supreme Court...."

that Order No. 335027 did not modify or change the three orders covering the Belcher Unit. It alleges that the order merely clarifies the position previously set forth in the increased density, offset, and hardship orders.

 A determination that Order No. 335027 clarifies rather than changes or modifies the prior orders relating to the Belcher Unit is dispositive of the issues raised by Forest. Issuance of an order which clarifies and does not modify or change a prior order is not a collateral attack on the original order.[32] If the hardship and increased density orders provide for a single unit allowable to be produced out of one or both wells, application of OCC–OGR 2–110 to determine the proper allowable for an increased density well is unnecessary. Clarification does not effect a change in the original order. Therefore, retroactive application is not an issue. Additionally, the Corporation Commission has the authority to clarify a previous order without a showing that the order is necessary to prevent waste or protect correlative rights.[33]

 To determine whether in issuing Order No. 335027 the Corporation clarified or modified the prior orders covering the Belcher Unit, we must distinguish between the terms "modify" and "clarify." "Modify" means to change or alter an existing administrative order. A modification order adjudicates matters outside the original order, or contradicts some portion of the previous order. When an order is "clarified," there is no change in the prior order. A "clarification order" merely supplements a prior order by refining its language to eliminate obscurity or ambiguity.[34]

The clarification order provides a single unit allowable to be established by the best well test provided in OCC–OGR 2–110.[35] This provision does not alter or change any provision of the three previous orders. In the findings of the location exception order, the Corporation Commission notes that an agreement had been reached which provided that production from the Belcher No. 2 would be 75% of the "unit allowable." The ordering provision provides that the Belcher No. 2 is granted 75% of the normal allowable. It also provides that Forest shall maintain a monthly allocation for the "wells."[36] Both the reference to a unit

32. *Amarex, Inc. v. Baker,* 655 P.2d 1040, 1046 (Okla.1982).

33. *Nilsen v. Ports of Call Oil Co.,* see note 10 at 102, supra; *Cabot Carbon Co. v. Phillips Petroleum Co.,* see note 10, supra; Note, "Interpretation of Corporation Commission Orders: The Dichotomous Court/Agency Jurisdiction," see note 9 at 319, supra; D. Pray, "The Oklahoma Well Spacing Act & Its Interpretation," see note 9, supra.

34. *Nilsen v. Ports of Call Oil Co.,* see note 10, supra; Note, "Interpretation of Corporation Commission Orders: The Dichotomous Court/Agency Jurisdiction," see note 10 at 316, supra; D. Pray, "The Oklahoma Well Spacing Act & Its Interpretation," see note 10, supra.

35. Order No. 335027 (the clarification order) provides in pertinent part:
"... This cause concerns interpretation of the maximum permitted rates of production for two gas wells known as the Belcher No. 1 and Belcher No. 2 ...
(T)he respondents, Oklahoma Natural Gas Co. et al. ('ONG') request an order clarifying Order Nos. 237085, 237086 and 252636....
The essence of the dispute is whether the hardship well order created a separate rate of production for the Belcher No. 1 well instead of the customary sharing of a maximum rate of permitted production among unit wells....
(T)he Commission ordered the combined production from the Belcher No. 1 and No. 2 wells not to exceed the *unit* allowable established by Forest under the rules of the Commission....
That pursuant to OCC–OGR 2–110, the best well test establishes the Belcher unit's permitted production pursuant to hardship Order No. 252636. Moreover, absent a subsequent Commission order establishing otherwise, in the event the capacity production from the hardship well exceeds what the unit may lawfully produce, the unit's permitted production shall be the capacity from the hardship well only ..."

36. Order No. 237085 (the location exception order) provides in pertinent part:
"... That Andover Oil and Company and Forest Oil Corporation agreed prior to the drilling of the unit well that this well should be allowed to produce no more than 75% of the unit allowable. That the petroleum engineer testifying here testified that in his opinion, no restriction on the allowable for this well was necessary to prevent violation of correlative rights but that he recommended that this well be allowed to produce no more than 75% of the unit allowable...."

allowable and to a production schedule tied to both wells clearly indicates that the location exception order established a single unit allowable for the Belcher Unit. The increased density order, issued on the same day as the location exception order, contains identical references to a "unit allowable" and to a monthly production schedule accounting for both "wells." [37] The language of the hardship order, issued nine months after the location exception and increased density orders, leaves no doubt that the two Belcher wells are governed by a single unit allowable. Paragraph one of the ordering paragraphs provides that the Belcher No. 1 is authorized to produce "at capacity." However, paragraph 2 requires Forest to report the combined production

> That this well shall be given 75% of the normal allowable....
> The applicant shall maintain a monthly allocation schedule for the wells...."

**37.** Order No. 237086 (increased density order) provides in pertinent part:

> "... That Andover Oil and Company and Forest Oil Corporation agreed prior to the drilling of the unit well that this well should be allowed to produce no more than 75% of the unit allowable. That the petroleum engineer testifying here testified that in his opinion, no restriction on the allowable for this well was necessary to prevent violation of correlative rights but that he recommended that this well be allowed to produce no more than 75% of the unit allowable....
> That this well shall be given 75% of the normal allowable....
> The applicant shall maintain a monthly allocation schedule for the wells...."

The location exception and increased density orders were issued on the same day, April 20, 1983. These orders were not entered with the intention to increase overall production from the Belcher Unit. They were issued on the premise that the Belcher No. 1 was not adequately draining the production unit. Although at the time of the original hearing on the increased density well, there was testimony that the Belcher No. 2 would drain a different source of supply than the No. 1 well, the evidence once the well was drilled was that it was draining from the same source as the No. 1 well. Under OCC–OGR 2–110 (1987), see note 7, supra, the number of wells in a unit is irrelevant. Wells of the same classification share a single well allowable. This rule was promulgated after the instant cause was filed; however, both the rule and the language of the three orders indicate

from the Belcher No. 1 and No. 2, and that the *combined production* "shall not exceed the unit allowable" established under the rules of the Corporation Commission.[38]

## IV

PURSUANT TO OCC–OGR 2–105(d) (1987), UNDERAGE ACCUMULATED BECAUSE OF FAILURE OF THE PURCHASER TO TAKE GAS FROM AN UNALLOCATED GAS WELL MAY BE APPLIED TO ADJUST OVERAGE PRODUCED.

■ Forest cites OCC–OGR 2–105(d) as support for the proposition that the overage produced in 1987 should be balanced by underages accumulated in previous years.[39]

that the Belcher Unit was entitled to only a single allowable for the entire unit.

**38.** Order No. 252636 (the hardship order) provides in pertinent part:

> "... 1. Forest Oil Corporation is hereby authorized to produce its A.O. Belcher No. 1 Well, drilled in Section 23, Township 5 North, Range 11 West, Caddo County, Oklahoma, as a Priority One—Hardship Well, under the provisions of Rules 1–101 and 1–305(b), of the General Rules of the Corporation Commission of Oklahoma, and is hereby authorized to produce said well at full capacity from the Springer common source of supply.
> 2. Forest Oil Corporation shall report combined production from its A.O. Belcher No. 1 and No. 2 Wells, and such combined production shall not exceed the unit allowable established by the Operator under the Rules of the Commission...."

Our finding that Order No. 335027 clarifies rather than modifies the prior orders covering the Belcher Unit is supported by testimony given by Forest witnesses. At hearings concerning the location exception, increased density, and hardship orders, Forest witnesses recognized that the allowable assigned to the Belcher Unit was a single unit allowable.

**39.** OCC–OGR 1–101 (1989) provides in pertinent part:

> "... 70. Overage shall mean the oil or gas delivered to a carrier, transporter or taker in excess of the allowable set by the Commission for any given period....
> 106. Underage shall mean the volume of allowable oil or gas not actually delivered to a carrier, transporter, or taker during any given proration period...."

The Belcher Unit was overproduced for the first time in 1987 with an overage of 105,918 MCF.

ONG insists Rule 2–105(d) is inapplicable to gas production, and that the Corporation Commission properly refused to apply past underages to the overages produced in 1987 from the Belcher Unit.

 Rule 2–105(d) provides that failure of a purchaser to "run or take" the allowable "shall" be grounds for reinstatement of accumulated underage. Corporation Commission rules have the force and effect of law.[40] Use of the term "shall" by a lawmaking body is normally considered as a legislative mandate equivalent to the term "must".[41] Therefore, if § 2–105(d) applies, adjustment of the overage by application of past underages should be allowed.

The term "run" is generally associated with transfers of crude oil from stock tanks, where it is stored after production, to a pipeline.[42] The term "take," in the oil and gas industry, is more generally associated with gas production.[43] ONG's assertion that Rule 2–105(d) is inapplicable to gas production is premised on the fact that the rule follows the general heading of OCC–OGR 2–100 Oil and Gas Production From Oil Pools. ONG argues that Rule 2–102(d) cannot apply because the Belcher wells are unallocated gas wells. This argument is unpersuasive. ONG's own witness recognized that two rules, OCC–OGR 2–109 Classification of Wells for Allowable Purposes and OCC–OGR 2–110 Allowable for Increased Density Well, which directly follow Rule 2–100, are routinely applied to unallocated gas wells. Rule 2–105(d) may properly be applied to adjust overages produced from an unallocated gas well.

This finding is supported by a revision in the Corporation Commission Rules. The subject matter formerly addressed in Rule 2–105(d) is now found in OCC–OGR 2–111.[44] Rule 2–111 concerns applications for reinstatment of cancelled underage for oil wells and for unallocated gas wells. Rule 2–111(B)(3) relates to unallocated gas wells and provides that "inability to sell gas during the proration period shall be grounds for reinstatement of cancelled underage."

Rule 2–105(d) does not restrict the accumulation of underages to either a specific time period, or to a limited number of MCFs. Underages may be accumulated under Rule 2–105(d) until they are balanced by equal runs in excess of the current allowables. In the instant cause, the underages accumulated from the Belcher Unit in 1986 alone are sufficient to balance the overage produced in 1987.[45]

V

THERE ARE NO COUNTERVAILING POLICIES TO JUSTIFY VICARIOUS ASSERTION OF CONSTITUTIONAL RIGHTS.

 Order No. 335027 provides that the unit allowable for the Belcher Unit is to be

---

Forest's records indicate the following underages were accumulated in previous years:

| Year | Underage/MCF |
| --- | --- |
| 1983 | 338,546 |
| 1984 | 354,083 |
| 1985 | 777,532 |
| 1986 | 222,452 |

**40.** *Ashland Oil Co. v. Corporation Comm'n,* 595 P.2d 423, 426 (Okla.1979).

**41.** *Schaeffer v. Shaeffer,* 743 P.2d 1038, 1040 (Okla.1987); *Fuller v. Odom,* 741 P.2d 449, 453 (Okla.1987); *TIB Corp. v. Edmondson,* 630 P.2d 1296–97 (Okla.1981).

**42.** *Long v. Magnolia Petroleum Co.,* 166 Neb. 410, 89 N.W.2d 245, 257 (1958); 8 Williams & Meyers, *Oil & Gas Law Manual of Oil & Gas Terms,* p. 874 (1987).

**43.** See, *Golsen v. ONG Western, Inc.,* 756 P.2d 1209, 1214 (Okla.1988) and 8 Williams & Meyers, *Oil & Gas Law Manual of Oil & Gas Terms,* note 42 at 975, supra (Discussing "take or pay" contracts in association with gas purchases.); "Take imbalance" refers to failure of pipelines to take gas in the same ratio as the seller's interest in production under normal property law concepts. L. Mosberg, Jr., "Practical Effects of the 'Blanchard' Case on the Payment of Royalty & Overriding Royalty on Production from Oklahoma Drilling & Spacing Units," 35 Okla. B.J. 2331 (1964); "Take aways" are clauses of gas purchase and sale contracts providing for price reductions under specified curcumstances. W. Watson, "The Natural Gas Policy Act of 1978 & Gas Purchase Contracts," 27B Rocky Mtn. Min.L.Inst. 1407, 1431 (1982); "Take or release clause" is a clause in a gas purchase and sale contract which gives the seller the right to terminate the contract if the buyer doesn't take minimum amounts of gas. 8 Williams & Meyers, *Oil & Gas Law Manual of Oil & Gas Terms,* note 42 at Supp.1989 p. 114, supra.

**44.** OCC–OGR Rule 2–111, see note 3, supra.

**45.** The Corporation Commission determined the 1987 overproduction to be 105,918 MCF. Forest

established by the best well test pursuant to OCC–OGR 2–110.[46] If the Belcher No. 1 produces in excess of the allowable established by the best well test, production from the Belcher No. 2 is overage. Forest alleges that the potential restriction on production from the Belcher No. 2 violates the Oklahoma Constitution and the United States Constitution. It asserts that Order No. 335027 deprives owners in the Belcher No. 2 of the opportunity to produce hydrocarbons. ONG argues that there is no constitutional violation, and that Forest lacks standing to assert the constitutional violation.

 It is unclear from Forest's brief exactly which parties it asserts have been denied constitutional protection. In Oklahoma, the establishment of a drilling and spacing unit results in statutory pooling of the royalty interest.[47] Therefore, the only parties who could conceivably be damaged are the working interest owners. However, Forest does not allege that its rights have suffered a constitutional blow. Generally, constitutional rights are personal and may not be asserted vicariously.[48] Exceptions to this general principal are al-

lowed only because of "the most weighty countervailing policies." [49] Nothing exists here which would justify the imposition of an exception.

## CONCLUSION

 An order of the Corporation Commission will be affirmed if supported by substantial evidence and the law.[50] When a Corporation Commission order is appealed, this Court is not required to weigh the evidence, but will review the evidence and sustain the decision of the Corporation Commission if the order appealed from is supported by substantial evidence.[51] Substantial evidence exists to support Order No. 335027 in so far as it operates to clarify the terms and provisions of the location exception, increased density, and hardship orders. The language of the orders themselves and testimony elicited at the respective hearings held before issuance supports the finding that a single unit allowable was established for the Belcher Unit.

 However, when reviewing the facts and testimony in the record to deter-

---

figures indicate that underages accumulated in 1987 alone equal 222,452 MCF.

**46.** OCC–OGR 2–110 (1989), see note 7, supra.

**47.** Title 52 O.S.Supp.1989 § 87.1 provides in pertinent part:
 "... In the event a producing well or wells are completed upon a unit where there are, or may thereafter be, two or more separately owned tracts, the first purchaser or purchasers shall be liable to any royalty owner or group of royalty owners holding the royalty interest under a separately owned tract included in such drilling and spacing unit for payment of proceeds from the sale of production from the drilling and spacing unit. Each royalty interest owner shall share in all production from the wells or wells drilled within the unit ..."
 5 Summers, "The Law of Oil & Gas," p. 127, Ch. 29, § 975 (1966).

**48.** *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 700, 104 S.Ct. 2694, 2701, 81 L.Ed.2d 580, 590 (1984); *Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830, 839 (1973); *Webb v. Wiley,* 600 P.2d 317, 319 (Okla.1979).

**49.** *Broadrick v. Oklahoma,* see note 48, 413 U.S. at 611, 93 S.Ct. at 2915, supra; *Webb v. Wiley,* see note 9, supra.

**50.** The Okla. Const. art. 9, § 20 provides in pertinent part:
 "... The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving an asserted violation of any rights of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. In all other appeals from orders of the Corporation Commission the review by the Supreme Court shall not extend further than to determine whether the Commission has regularly pursued its authority, and whether the findings and conclusions of the Commission are sustained by the law and substantial evidence. Upon review, the Supreme Court shall enter judgment, either affirming or reversing the order of the Commission appealed from...."
 *Corporation Comm'n v. Union Oil Co.,* 591 P.2d 711, 717 (Okla.1979).

**51.** *Samson Resources Co. v. Oklahoma Corp. Comm'n,* 742 P.2d 1114, 1116 (Okla.1987); *Currey v. Corporation Comm'n,* 617 P.2d 177, 179 (Okla.1979), *cert. denied,* 452 U.S. 938, 101 S.Ct. 3080, 69 L.Ed.2d 952 (1981), *reh'g denied,* 453 U.S. 927, 102 S.Ct. 890, 69 L.Ed.2d 1023 (1981).

mine whether a Corporation Commission order is based on substantial evidence, we look not only at evidence tending to support the order but also take into consideration evidence in the record which fairly detracts from its weight.[52] The testimony elicited from Corporation Commission employees stating that OCC–OGR 2–105(d) should not be applied to the instant cause to adjust overage from the Belcher Unit, because it is inapplicable is unpersuasive. Because OCC–OGR 2–105(d) may properly be applied to an unallocated gas well, the Corporation Commission erred in not adjusting the overage produced in 1987 from the Belcher Unit by application of accumulated underage.

HARGRAVE, C.J., and HODGES, DOOLIN, ALMA WILSON and SUMMERS, JJ., concur.

OPALA, V.C.J., and LAVENDER and SIMMS, JJ., dissent.

LAVENDER, Justice, dissenting:

The court in its opinion in this matter held that pursuant to OCC–OGR 2–105(d), underage of gas accumulated when the purchaser fails to take from an unallocated gas well may be applied to adjust the overage produced. Upon further study, including a more thorough examination of the record, I now believe that this court was in error in so holding. I therefore, would grant appellees' petitions for rehearing and would affirm Corporation Commission Order No. 335027.

Rule 2–105(d) is a rule under the general heading of OCC–OGR 2–100 Oil and Gas Production *From Oil Pools.* The rule applies to underage accumulated from oil wells, not gas wells. The Commission's technical advisor testified to this fact.

Q. Do you believe that 2–105(D) allows for the accumulation of underage in a gas well to be applied to future overages?

A. Underage under unallocated gas wells are not carried forward.[1]

Further, the technical advisor testified that the Commission's *long standing policy* has never allowed for underage to be accumulated or carried forward from an *unallocated gas pool* under this rule or any other rule.

Q. Mr. Fair, has that been a consistent policy at the Commission that underage for unallocated gas wells is not carried forward or accumulated?

A. Yes.

. . . .

Q. Is there any rule that you are aware of that applies to accumulating underage in unallocated gas wells?

A. In unallocated gas wells, no.[2]

The United States Supreme Court in *Udall v. Tallman*,[3] stated:

When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. '[W]e need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings.'

. . . .

When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order. 'Since this involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt.... The ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'

(citations omitted).[4]

In the present case, the common source of supply is a *gas* pool, not an *oil* pool.

---

**52.** *Mustang Prod. Co. v. Corporation Comm'n,* 771 P.2d 201, 203 (Okla.1989).

**1.** Record at 1730–31.

**2.** Record at 1731.

**3.** 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

**4.** *Id.* at 16–17, 85 S.Ct. at 801.

Rule 2–331, not 2–105(d), governs production from unallocated gas wells. However, OCC's technical manager did testify that some rules for unallocated gas wells have been used interchangeably with the rules for oil wells. For instance 2–331, in the rule itself cross references to 2–110.[5] *This court* therefore determined that as *some* rules are applied interchangeably to unallocated gas wells, this would hold true for 2–105(d) as well. Yet, in *Toxic Waste Impact Group v. Leavitt,*[6] we ruled that "[a] court should not substitute its own judgment for that of an agency, particularly in the area of expertise which the agency supervises."

In the present case, the record is void of any *evidence* that this particular rule has ever been used for unallocated gas wells. Forest Oil presents testimony from its witness that in *his opinion* the rule should be so applied, however, this is only argument, *it is not evidence.* The witness cannot cite to one instance where the rule as he suggests has been so applied. Moreover, in 1988, Forest Oil met with the Corporation staff and their position then as now was that the rule did not apply.[7] Given that, and the unrefuted testimony of OCC's technical department manager, I fail to see the support for the view of the majority that the "testimony elicited from Corporation Commission employees ... is unpersuasive."[8]

In reaching its decision the majority opinion emphasized the fact that the word "take" appears in the first sentence of rule 2–105(d). It then noted that this term is generally associated with gas production and the term "run" with oil production. If that be true, the opinion seemed to overlook the second sentence of rule 2–105(d) which states that "[u]nderages may be accumulated until they are balanced by equal *runs* in excess of current allowables."

Precedent requires that the proper construction of a statute is that which gives full effect to and harmonizes all provisions of the statute.[9] The Court "must not be guided by a single sentence or member of a sentence, but must look to the provisions of the whole law and to its object and policy."[10] The majority states in its opinion that Corporation Commission rules have the force and effect of law.[11] I submit therefore, that by not giving effect to the rule in its entirety, the majority erred in failing to follow well established rules of construction.

Finally, in its opinion, this court took judicial notice of OCC–OGR 2–111, a new rule allowing for twenty-five percent (25%) underage from an unallocated gas well to be carried forward for one year. In reviewing the record, I no longer believe that rule 2–111 supports this court's decision; the new rule was clearly a substantive change from its former state. Moreover, application of this new rule was superfluous in that the record itself substantiated the fact that 2–105(d) had no relevance to the present set of facts. However, as the court chose to rely on this new rule, it should also be bound to take judicial notice of OCC's reasoning for making the change.[12] In discussing the adoption of the new rules, the OCC in Order No. 337475 beginning with the first full paragraph on page 3 states unequivically that:

5. Record at 1734.

6. 755 P.2d 626, 630 (Okla.1988).

7. Record at 1701.

8. 61 OBJ 1765, 1771 (1990).

9. *Seal v. Corporation Com.,* 725 P.2d 278, 289 (Okla.1986).

10. *Kelly v. Robinson,* 479 U.S. 36, 43, 107 S.Ct. 353, 358, 93 L.Ed.2d 216 (1986) (citations omitted).

11. *Ashland Oil Co. v. Corporation Comm'n,* 595 P.2d 423, 426 (Okla.1979).

12. In the amendment to its original opinion the majority complains that in doing so I am "supplementing" the record. With all due respect Rule 2–111 was neither briefed nor raised by either party when the court first considered this case. Certainly, however, it was within the court's prerogative to take judicial notice of a proposed rule. Likewise, on rehearing it is not "supplementing the record" for this court to take judicial notice of *published proceedings issued by the Commission.*

Under the current rules, *unallocated gas wells do not accrue underage when they do not produce the maximum permitted rate of production.* However, the proposal [rule 2–111] would permit such wells to use a portion of the underage toward future production under certain circumstances....

(emphasis added).

I would grant rehearing and sustain the OCC's holding in Order No. 335027 that overage for the 1987 Belcher Unit to offset the earlier underage of production should not be excused.

I am authorized to state that Chief Justice OPALA and Justice SIMMS join in the views herein expressed.